# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| GERDA ZINNER and STORY VANNESS, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| THE STATE OF TENNESSEE; | ) | |
| STATE INSURANCE COMMITTEE, THE | ) | **JURY TRIAL DEMANDED** |
| STATE INSURANCE COMMITTEE | ) | |
| MEMBERS IN THEIR OFFICIAL | ) | |
| CAPACITIES (Jim Bryson, David Lillard; | ) | |
| Jason Mumpower; Carter Lawrence; Juan | ) | |
| Williams; Bo Watson; Patsy Hazelwood; | ) | |
| Michelle Consiglio-Young; Judi Knecht; | ) | |
| Terry Carroll; and Holly Girgies); LOCAL | ) | |
| EDUCATION INSURANCE COMMITTEE; | ) | |
| LOCAL EDUCATION COMMITTEE | ) | |
| MEMBERS IN THEIR OFFICIAL | ) | |
| CAPACITIES (Jim Bryson; David Lillard; | ) | |
| Jason Mumpower; Carter Lawrence; | ) | |
| Maryanne Durski; Kristy Baddour; Erin | ) | |
| Johnson; and Jennifer White); TENNESSEE | ) | |
| DEPARTMENT OF FINANCE AND | ) | |
| ADMINISTRATION; THE COMMISSIONER | ) | |
| OF THE DEPARTMENT OF FINANCE | ) | |
| AND ADMINISTRATION IN HIS | ) | |
| OFFICIAL CAPACITY, Jim Bryson; THE | ) | |
| UNIVERSITY OF TENNESSEE; THE | ) | |
| PRESIDENT OF THE UNIVERSITY OF | ) | |
| TENNESSEE SYSTEM IN HIS OFFICIAL | ) | |
| CAPACITY, Randy Boyd; KNOX COUNTY | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

## <u>INTRODUCTION</u>

1.     This is a case about discrimination in employment, health care, and education.

Tennessee's public employee health benefits program has unlawfully deprived Plaintiffs of

coverage for essential medical services because of the Plaintiffs' sex and because they are transgender. The defendants continue to carry out their discriminatory practices. Plaintiffs therefore bring this lawsuit for declaratory, compensatory, and equitable relief.

2.      Plaintiff Gerda Zinner is a 30-year-old woman. She is an Academic Advisor at the University of Tennessee at Chattanooga, where she has worked since September 2019.

3.      Plaintiff Story VanNess is a 38-year-old woman. She was a special education teacher at Knox County Board of Education from July 2016 through July 2022.

4.      Plaintiffs each require medically-necessary treatment for a medical condition called gender dysphoria.

5.      Gender dysphoria is the clinically significant distress that can result from the dissonance between a transgender individual's gender identity and sex assigned at birth.

6.      Plaintiffs are current or former enrollees in the State of Tennessee Comprehensive Medical and Hospitalization Program ("the Program"). The Program covers 290,000 state higher education, local education, and local government employees, retirees, and their dependents. The Program's mission is "to deliver comprehensive, affordable, dependable and sustainable benefits"- but when it comes to transgender enrollees, the Program is not fulfilling that mission.

7.      The Program is governed by the State of Tennessee through statutory committees. The State of Tennessee and participating local education agencies provide employees, as part of their compensation, with health care coverage for the employees and their dependents through the Program. Both the University of Tennessee and Knox County Board of Education are Program participants.

8.      However, the Program denies coverage of "[s]urgery or treatment for, or related to, sex transformations" (the "Exclusion").

9. The Exclusion, with its express reference to "sex transformations," bars coverage for transgender people-and only transgender people-because of their sex, including because they are transgender.

10. This sweeping Exclusion denies coverage for all health care, other than counseling, provided in relation to a person's transgender status.

11. It contravenes the well-established medical consensus that transgender-related health care can be medically necessary and even life-saving. Program enrollees who are not transgender do not face similar hurdles and indeed can receive coverage for the same care that is denied to transgender enrollees because, for non-transgender employees, these treatments are not "for . . . sex transformations."

12. Plaintiffs have each been denied coverage under the Program for medically necessary gender-affirming health care because they are transgender.

13. Plaintiffs have been forced to incur financial hardships and even forego medically-necessary healthcare due to this unlawful Exclusion.

14. Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of the Program's targeted discrimination against transgender enrollees, which wrongly deems their health care needs as unworthy of equal coverage.

15. By categorically depriving transgender enrollees in the Program of coverage for the treatment of gender dysphoria, Defendants unlawfully discriminate against Plaintiffs, and all other transgender Program members. In doing so, Defendants deny equal compensation for equal work to employees because they are transgender.

16. Defendants maintain, renew, and continue to apply the Exclusion to deny medically necessary care to Plaintiffs because of their sex, causing them ongoing harm.

17.     Plaintiffs have repeatedly asked Defendants to remove the Exclusion from the Program, including in correspondence and through various administrative filings. Defendants have steadfastly refused and/or ignored Plaintiffs' requests.

18.     This discrimination against Plaintiffs violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), and Title VII of the Civil Rights Act of 1964 ("Title VII").

19.     Plaintiffs bring this lawsuit to challenge the categorical exclusion of transgender-related health care contained within the Program, to obtain a judgment to redress their individual injuries, and to have the Exclusion declared unlawful.

## JURISDICTION AND VENUE

20.     This action is brought pursuant to 42 U.S.C. § 1983, with claims arising under the equal protection guarantee of the Fourteenth Amendment of the United States Constitution; Title VII, 42 U.S.C. § 2000e, et seq.; and Title IX, 20 U.S.C. § 1681, et seq.

21.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).

22.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 2000e-5(g)(1).

23.     Under 28 U.S.C. § 1391, venue is proper in the Middle District of Tennessee because all defendants are residents of Tennessee and at least the following Defendants reside in this District: the State, the Department of Finance and Administration, the State Insurance Committee, and the Local Education Insurance Committee. Additionally, the Defendants named in their official capacity perform their official duties in Nashville and, on information and belief, at least Defendants Bryson, Lawrence, and White are domiciled in the District. Id. § 1391(b)(1). Further, a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Nashville, Tennessee. Id. § 1391(b)(2).

# PARTIES

## A. Plaintiffs

24. Plaintiff Gerda Zinner resides in Hamilton County, Tennessee. She is a historian and educator employed as an Academic Advisor at the University of Tennessee at Chattanooga. She is enrolled in a Program-offered State Plan (defined below), administered by BlueCross BlueShield of Tennessee ("BCBST").

25. Plaintiff Story VanNess resides in Knox County, Tennessee. She was employed as a Special Education Teacher by the Knox County Board of Education from July 2016 through July 2022. While employed by Knox County Schools, she was enrolled in the Program-offered Local Education Plan (defined below) administered by BCBST.

## B. Defendants

26. The State of Tennessee (the "State") offers health benefit plans-the Program-to its employees. The State has 15 or more employees and is engaged in the business of government, which affects commerce.

27. The State Insurance Committee (the "State Committee") is a statutorily-created committee whose purpose is to "approve for eligible state employees a group insurance plan" (the "State Plan") and "determine the premiums, benefits package, funding method, administrative procedures, eligibility provisions, and rules" for the State Plan.[1] Tenn. Code Ann. § 8-27-202(a), (b). The State Plan is part of the Program.

28. The State Committee consists of eleven members ("State Committee Members"), each of whom is named here only in their official capacity. The members of the State Committee

---

[1] Multiple plans are offered under the State Plan allowing enrollees to choose, for example, between claims administrators and different premium and coinsurance levels. All plans under the State Plan are governed by the same terms. "State Plan" is used to refer to all plans offered to state employees, including the specific plan in which Ms. Zinner is enrolled.

are "the commissioner of human resources, the state treasurer, the commissioner of commerce and insurance, the comptroller of the treasury, the commissioner of finance and administration, the chair of the senate finance, ways and means committee, the chair of the house of representatives finance, ways and means committee, a member to be appointed by the board of directors of the Tennessee state employees association, and three (3) state employees." Tenn. Code Ann. § 8-27-201(a). One of the state employee representatives "shall be an employee of either the University of Tennessee or the state university and community college system." Tenn. Code Ann. § 8-27-201(b)(2). The State Committee Members as of the filing of this complaint are Jim Bryson; David Lillard; Jason Mumpower; Carter Lawrence; Juan Williams; Bo Watson; Patsy Hazelwood; Michelle Consiglio-Young; Judi Knecht; Terry Carroll; and Holly Girgies. The State Committee is empowered to determine, define, adopt, and remove health care benefits and exclusions, such as the Exclusion, for the State Plan. The State Committee convenes in Nashville, Tennessee.

29. The Local Education Insurance Committee ("LE Committee") is a statutorily-created committee whose purpose is to "approve a group insurance plan" (the "Local Education Plan") "for eligible employees of local education agencies" and "determine the premiums, benefits package, funding methods, administrative procedures, eligibility provisions, and rules" of the Local Education Plan.[2] Tenn. Code Ann. § 8-27-302(a), (b). The Local Education Plan is part of the Program.

30. The LE Committee consists of eight members ("LE Committee Members"), each of whom is named here only in their official capacity. The LE Committee Members are "a representative of local school boards to be selected by the Tennessee School Boards Association,

---

[2] Multiple plans are offered under the Local Education Plan allowing enrollees to choose, for example, between claims administrators and different premium and coinsurance levels. All plans under the Local Education Plan are governed by the same terms. "Local Education Plan" is used to refer to all plans offered to employees of local education agencies, including the specific plan in which Ms. VanNess was enrolled.

the state treasurer, the commissioner of commerce and insurance, the comptroller of the treasury, the commissioner of finance and administration, and three (3) teachers appointed to represent the three (3) grand divisions" and a department of education representative. Tenn. Code Ann. § 8-27-301. The LE Committee Members as of filing of this complaint are Jim Bryson; David Lillard; Jason Mumpower; Carter Lawrence; Maryanne Durski; Kristy Baddour; Erin Johnson; and Jennifer White. The LE Committee is empowered to determine, define, adopt, and remove health care benefits and exclusions, such as the Exclusion, for the Local Education Plan. The LE Committee convenes in Nashville, Tennessee.

31.     The Department of Finance and Administration ("DFA") staffs the State Committee and LE Committee. Tenn. Code Ann. § 8-27-101. The DFA works with the LE Committee to determine the form of payment for State funding for the Local Education Plan. Tenn. Code Ann. § 8-27-303(e)(1). The State Committee and LE Committee delegate certain authority for plan administration to the DFA. Tenn. Code Ann. § 8-27-102. The Program plan documents also charge the DFA with specific administrative responsibilities. The DFA has 15 or more employees and is engaged in the business of government, which affects commerce. It is located at 312 Rosa L. Parks Avenue, Suite 1900, Nashville, TN 37243.

32.     Jim Bryson is the Commissioner of the DFA. He is the executive of the Department, responsible for oversight of the Department's day-to-day operations, including exercising ultimate supervisory authority over personnel. As Commissioner, he is also the chair of the State Committee and LE Committee. He is named only in his official capacity.

33.     The University of Tennessee is a system of public universities created and partially funded by Tennessee. The State Plan under the Program is the only group insurance plan that may be offered to employees of the University of Tennessee. Tenn. Code Ann. § 8-27-202(c). The University of Tennessee receives federal funding through a wide variety of programs, including, but not limited to, institutional funding, funding for research and development, funding for student

financial aid, and funding from COVID-19 Stimulus programs. It has 15 or more employees and is engaged in the business of government and the business of education, which affects commerce. It is located at 505 Summer Place, UT Tower #1288, Knoxville, TN 37902.

34.     Randy Boyd is the President of the University of Tennessee System. The President is the chief executive officer of the statewide university system. The President is responsible for executive management and administration of the system and oversight of the operation of its campuses and institutes. The President has ultimate authority over the executive director of payroll, benefits and retirement and over the chief human resources officer, who is responsible for employee recruitment, payroll, and benefits services. The President is named solely in his official capacity.

35.     The Knox County Board of Education ("Knox County Schools") is a nine-member board that does business as and is known as "Knox County Schools." Knox County Schools is a local education agency and political subdivision that operates the public schools in Knox County, Tennessee. It has elected to participate in the Local Education Plan under the Program. It receives federal funding through a wide variety of programs, including, but not limited to, the Federal ROTC Salaries Reimbursement program. It has 15 or more employees and is engaged in the business of government and the business of education, which affect commerce. It is located at 400 W. Summit Hill Drive, Knoxville, TN 37902.

36.     Defendants the State, State Committee, DFA, and University of Tennessee (collectively, the "State Defendants") jointly provide and share responsibility for the provision of health coverage to state employees. The State Defendants collectively have 15 or more employees and are engaged in the business of government or education, which affects commerce.

37.     Defendants the State, LE Committee, DFA, and Knox County Schools (collectively, the "Local Education Defendants") jointly provide and share responsibility for the provision of health coverage to employees of local education agencies. The Local Education

Defendants collectively have 15 or more employees and are engaged in the business of government or education, which affects commerce.

## EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS

***A.     Ms. Zinner***

38.     On August 22, 2022, Ms. Zinner timely filed charges of sex discrimination in violation of Title VII with the Equal Employment Opportunity Commission ("EEOC") against the State Defendants.

39.     On May 17, 2023, the Department of Justice issued notice of right to sue letters for Ms. Zinner's charges.

***B.     Ms. VanNess***

40.     On August 18, 2022, Ms. VanNess timely filed charges of sex discrimination in violation of Title VII with the EEOC against the Local Education Defendants.

41.     On May 17, 2023, the Department of Justice issued notice of right to sue letters for Ms. VanNess's charges.

## FACTS

42.     Ms. Zinner and Ms. VanNess are transgender women. This means that, while they were assigned the sex of "male" at birth based on external physical sex characteristics, they are women.

43.     A transgender person is someone whose sex assigned at birth, as determined by the appearance of external sex characteristics, does not match that person's innate, internal sense of being male, female, or some other category (often referred to as "gender identity"). Gender identity cannot be voluntarily changed. Most of the time, people born with male-typical external characteristics experience themselves as male, and those with female-typical external characteristics experience themselves as female. However, for a transgender person, their external

characteristics and their internal perception of their sex do not match. This incongruence can and often does lead to a condition called gender dysphoria.

44. As noted above, gender dysphoria is the clinically significant distress that results from incongruence between one's sex assigned at birth and one's gender identity.

45. Being transgender bears no relation to a person's ability to perform or contribute to society. People with untreated or undertreated gender dysphoria, or a history of experiencing anti-transgender discrimination, are more likely than others to experience anxiety, depression, or other negative mental health outcomes. But people who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status. Transgender people, both in Tennessee and around the world, have served their communities in diverse ways, including as small business owners, parents, neighbors, elected officials, public servants, musicians, artists, scientists, faith leaders, teachers, and healthcare providers.

*A.*      *Transgender People and Gender Dysphoria*

46. Many transgender people experience gender dysphoria, which, when untreated, can cause anxiety, depression, difficulty with social functioning, and suicidality. Treatment for gender dysphoria improves mental health outcomes and quality of life, while experiences of discrimination, violence, or rejection for being transgender worsen mental health outcomes and quality of life.

47. The World Professional Association for Transgender Health ("WPATH"), an interdisciplinary professional and educational organization devoted to transgender health, has established internationally accepted Standards of Care (the "WPATH Standards of Care") for the treatment of people with gender dysphoria. Major medical and mental health organizations, including the American Medical Association, the Endocrine Society, the American Psychiatric

Association, and the American Psychological Association, have endorsed the WPATH Standards of Care as the authoritative standards of care.

48.     The treatment for gender dysphoria, as recommended by WPATH, is to assist the person in undergoing a gender transition that will alleviate the distress caused by gender dysphoria and allow the person to live in alignment with their gender identity. The transition process has three main components-social, pharmacological, and surgical.

49.     Social transition involves bringing a person's gender expression and social sex role into alignment with their gender identity. It may include wearing different clothes, using a new name and pronouns, and interacting with peers and one's social environment in a manner that matches the person's gender identity.

50.     With pharmacological treatment, a physician may also prescribe medications that change the hormone balance in the body to be consistent with the person's gender identity. For example, a transgender woman would be prescribed medications that reduce testosterone and replace it with estrogen, which will result in mental health benefits and development of typically female sex characteristics. Common effects of estrogen include body fat redistribution, skin dryness and thinning, reduced perspiration, breast development, decreased muscle mass and strength, and thinning and slower growth of body and facial hair.

51.     One or more forms of surgical treatment are sometimes also medically necessary to alleviate dysphoria experienced by transgender persons and caused by having incongruent sex characteristics.[3] Vaginoplasty, breast augmentation, and facial gender-affirming surgery are some surgical procedures that have proven safe and effective in treatment of gender dysphoria for transgender women.

---

[3] Sex characteristics include characteristics directly involved in reproduction, like genitals and reproductive organs, as well as others not directly involved in reproduction, like breasts and facial features.

52.     The WPATH Standards of Care establish guidelines for when these treatments may be medically necessary for a given individual, including factors such as having a diagnosis of gender dysphoria, capacity to consent to treatment, and an absence of contraindications.

53.     Efforts to change a person's innate gender identity, sometimes referred to as "conversion therapy," have proven ineffective and harmful and are widely recognized as ethically and clinically unsound.

**B.      *Ms. Zinner***

54.     As a child in Auburn, Alabama, even before she had the vocabulary to call herself a transgender girl, Ms. Zinner understood herself to be like other girls and in turn often gravitated towards activities culturally considered to be more feminine. She wore jewelry and painted her nails.

55.     There were many times during Ms. Zinner's childhood where someone else would categorize her as a boy; these situations made her aware of the disconnect between how she was perceived by others and how she saw herself. When there were separate activities for boys and girls and she was not allowed to participate in the girls' activities, she felt excluded and misunderstood.

56.     Ms. Zinner discovered language about medical transition while reading an encyclopedia as a pre-teen. She recalls making a mental note that she might need that someday. As a teenager, she read a story about a trans girl and wished she had been able to participate in life as a girl too.

57.     When she was 18, Ms. Zinner began to tell her family and friends that she is transgender. She also took steps to live openly as such, including wearing typically feminine clothing and accessories, shaving her body hair, and using feminine pronouns when safe to do so.

58.     In November 2019, after considerable deliberation, Ms. Zinner began hormone replacement therapy under the care and supervision of Dr. Isabel Lowell.

59. The hormone replacement therapy made Ms. Zinner's features more feminine over time and reduced the gender dysphoria caused by her typically male secondary sex characteristics. Hormone therapy also improved her mood and her sense of self-worth.

60. In August 2020, Ms. Zinner obtained a legal name change and came out as a transgender woman at work.

61. Ms. Zinner's social transition and hormone therapy, while helpful, have been inadequate to treat the dysphoria she experiences because of having typically male genitalia. Her remaining typically male sex characteristics continue to impede her ability to live her life fully. As a result, each day Ms. Zinner must cope with significant distress and alienation from her own body. Ms. Zinner's under-treated gender dysphoria causes her to experience stress and anxiety, have trouble sleeping, and feel depressed and preoccupied.

62. Over a period of years, Ms. Zinner worked with her health care providers to assess if gender-affirming surgery would address her gender dysphoria and be clinically appropriate for her. After several consultations between 2020 and 2022, Ms. Zinner's providers determined that gender-affirming vaginoplasty was medically necessary to alleviate her gender dysphoria, and upon the recommendation of her doctor and two therapists, Ms. Zinner sought to have surgery.

63. Surgery will allow Ms. Zinner to live and work without the burden and stress of gender dysphoria.

64. On June 12, 2020, Ms. Zinner called BCBST to ask if the State Plan would cover transgender-related care, specifically surgeries. A representative told Ms. Zinner that the State Plan excluded transgender-related surgeries. Ms. Zinner requested clarification of the policy.

65. On June 15, 2020, Ms. Zinner received a letter from BCBST that stated, "gender reassignment surgery isn't covered under your plan."

66. After learning about the Exclusion, Ms. Zinner experienced increased anxiety and sleeplessness because of her fear that she would not be able to access the health care she needs.

67. In September 2020, Ms. Zinner had an initial surgical consultation at the University of Alabama with Patrick Selph, M.D., a surgeon and board-certified urologist.

68. On October 1, 2020, Ms. Zinner wrote to the DFA and explained that BCBST had told her that the State Plan would not cover transgender-related surgery, and she asked if the State Plan would include transgender-related care in 2021.

69. A DFA Benefits Administration employee told Ms. Zinner that all the State Plan options for 2021 would continue to exclude transgender-related care.

70. In May 2021, Ms. Zinner emailed the University of Tennessee's Executive Director of Payroll, Benefits, and Retirement Robert Chance, asking if the Exclusion could be removed or if the university could take other steps to provide coverage for transgender-related care. Mr. Chance replied to Ms. Zinner's email and stated that he would inquire with the State Committee.

71. Following a second consultation in June 2021, Dr. Selph scheduled Ms. Zinner's gender-affirming vaginoplasty for January 11, 2022.

72. In or around August 2021, Ms. Zinner emailed Mr. Chance again because her question remained unanswered. Mr. Chance responded that the State Committee had to approve removal of the Exclusion, and that it "had not been inclined to change benefits in this area in the past and is not likely to change them in the near future." Mr. Chance gave Ms. Zinner the names of members of the State Committee and recommended that she contact them directly.

73. In August 2021, Ms. Zinner emailed several State Committee members, including then DFA Commissioner and Committee Chair Butch Ely and Defendants Girgies, Hazelwood, Lillard, Mumpower, Lawrence, Watson, Williams, and asked the State Committee to remove or modify the Exclusion so transgender-related care would be covered. Ms. Zinner attached a memorandum explaining why it is unlawful to exclude transgender-related care from health insurance plans and requested to speak to the issue in a State Committee meeting. None of the members agreed to assist. Most ignored her entirely.

74.     On November 22, 2021, Dr. Selph's office contacted Ms. Zinner to let her know that her surgery was cancelled due to the Exclusion. Ms. Zinner experienced a tremendous emotional impact from the surgery cancellation-she broke down upon receiving the message and when discussing the news with family.

75.     Ms. Zinner cannot afford to pay for the surgery out of pocket.

76.     Ms. Zinner meets BCBST's coverage criteria for transgender-related surgery.

77.     Ms. Zinner had-and continues to have-an ongoing need for transgender-related surgery. In late May 2022, Dr. Selph submitted a pre-authorization request for gender-affirming vaginoplasty to BCBST. On June 3, 2022, Ms. Zinner received an initial adverse determination denying coverage for the vaginoplasty due to the Exclusion.

78.     Ms. Zinner appealed the denial of coverage under the Program; the denial was upheld based on the Exclusion.

79.     Because of her inability to access her medically-necessary vaginoplasty, Ms. Zinner feels that her life is on hold. Her unmet healthcare needs continue to weigh on her, leading her to feel stressed, anxious, depressed, and preoccupied.

**C.     Ms. VanNess**

80.     As a young child in Arkansas, Ms. VanNess knew that she didn't meet others' expectations that she was a boy and should be masculine. Even without the language to describe her experience, she knew that something wasn't right: she wanted to do things she saw other girls doing, like gymnastics and learning about makeup, but she was instead made to play basketball and baseball-activities her family and community understood to be "for boys."

81.     When she was ten years old, a neighbor child told Ms. VanNess that if she kissed her shoulders, she would "turn into a girl." For weeks after that, Ms. VanNess kissed her shoulders every night.

82.     As an adolescent, Ms. VanNess recalls she felt it was extremely unfair that her sister's facial features were typically female, while hers developed to look more and more masculine, causing her anguish.

83.     Ms. VanNess first encountered other transgender people when she was 17 or 18. She began talking to transgender women and discovered that their experiences resonated with her.

84.     Ms. VanNess first told others that she is transgender in her early 20s. She received a formal diagnosis of gender dysphoria and began to transition, including using hormone replacement therapy. She faced ridicule and lost most of the relationships that were important to her because of discrimination. When she lost her job and housing, she had to move back home and was forced to pause her transition and conceal her female identity. Although this was exceptionally difficult and worsened Ms. VanNess's dysphoria, the alternative was homelessness.

85.     In 2016, Ms. VanNess received a Bachelor of Science in Education and a Bachelor of Arts in French, along with her teacher's license. Ms. VanNess began working at Knox County Schools in July 2016 as a special education teacher. Teaching was her lifelong ambition.

86.     In early 2020, Ms. VanNess realized that she would not be able to continue living with her dysphoria. She was experiencing suicidal thoughts and feelings several times each week.

87.     Ms. VanNess saw Aleana Young-Hilsinger, LCSW, in or around June 2020, who reconfirmed her diagnosis of gender dysphoria.

88.     In August 2020, Ms. VanNess told her friends that she was transgender and asked them to start referring to her by her chosen name and pronouns. She resumed hormone replacement therapy under the supervision of her physician, Dr. John Law.

89.     In December 2020, Ms. VanNess came out as transgender at work.

90.     Hormone replacement therapy has been instrumental for Ms. VanNess's wellbeing. She is able to access emotions she could not previously access, and she feels more at home in her body.

91.     However, despite the benefits of hormone replacement therapy, Ms. VanNess still experienced significant emotional distress due to the incongruences between her gender and her typically masculine chest and facial features. She experiences significant stress and anxiety about having masculine facial features alongside her otherwise feminine presentation. While she used breast forms to feminize the appearance of her chest, this was inadequate to fully address the dysphoria she felt related to her chest and alleviate her distress. She has had recurring mental health crises stemming from her gender dysphoria.

92.     The hormone replacement therapy cannot change the underlying bone structure of her facial features and did not change Ms. VanNess's chest in a way that addressed her gender dysphoria.

93.     Ms. VanNess fears for her life because of her masculine facial features and the increased scrutiny on and violence towards people who are visibly transgender, especially trans women. Ms. VanNess feels extremely unsafe in public. Every time she leaves the house, she braces herself for a violent attack. She experiences significant distress because, in addition to treating her gender dysphoria, facial gender-affirming surgery would make Ms. VanNess safer in public, but the Exclusion made this possibility inaccessible to her.

94.     Between June and October of 2021, Ms. VanNess consulted with her medical providers regarding gender-affirming surgery. Ms. VanNess's providers concluded that she has gender dysphoria provoked by her typically masculine facial features and chest. As a result, those providers determined that facial gender-affirming surgery and breast augmentation are medically necessary for Ms. VanNess, and upon the recommendation of her doctor, therapist, and two surgeons, Ms. VanNess sought to have surgery.

95.     Ms. VanNess meets BCBST's coverage criteria for transgender-related surgery.

96.     On October 20, 2021, Dr. Salam Al Kassis, M.D., a board-certified surgeon at Vanderbilt University Medical Center, submitted a pre-authorization request for coverage of facial gender-affirming surgery and breast augmentation to BCBST.

97.     On October 29, 2021, Ms. VanNess received a notice from BCBST denying the pre-authorization request for coverage under the Local Education Plan. The notice cited the Program's Exclusion as the sole basis for denying coverage.

98.     On February 4, 2022, Ms. VanNess appealed the denial of coverage. On March 2, 2022, BCBST issued another adverse determination upholding the original denial of coverage. The Exclusion was the only reason for the denial.

99.     Despite the denial, Ms. VanNess knew she could not go without the medically necessary surgery.

100.    On April 11, 2022, Ms. VanNess paid out of pocket for breast augmentation surgery to at least partially alleviate her distress. Obtaining the breast augmentation caused Ms. VanNess to feel better and feel more like herself in her body. However, because of the Exclusion, she had to spend all of her savings, get financial assistance from friends, and delay paying other bills.

101.    On June 7, 2022, Ms. VanNess again appealed the denial of coverage under the Program. On June 28, 2022, Ms. VanNess received a notice from the BCBST Level II Committee upholding the denial of coverage. The notice stated that the sole basis for the denial was the Exclusion.

102.    Ms. VanNess cannot afford to pay out of pocket for facial gender-affirming surgery.

103.    In July 2022, Ms. VanNess felt that she had no choice but to leave her job in part because of her inability to access necessary transgender-related care under the Local Education Plan.

104.    Ms. VanNess seeks to continue working as an educator. She made significant investments, both of time and money, into the necessary education, credentials, and training to be

a teacher in Tennessee to support herself and because she cares deeply about helping members of her community develop the skills to attain their full potential. In fact, in 2022, she attained a master's degree in educational leadership to pursue positions in school administration.

105.    Although Knox County Schools continues to participate in the Program and the Exclusion is still in place, Ms. VanNess made the difficult decision to reapply for teaching positions within the county. She has been un- or under-employed since July 2022 and teaching is necessary for Ms. VanNess to maintain her professional license. She has since reapplied to six positions within Knox County Schools and she continues to apply to state and local government employers within Tennessee.

106.    Ms. VanNess continues to experience severe gender dysphoria from her facial features. Her face is the first thing that she sees when she looks in the mirror, and the first thing that others see when they look at her. When Ms. VanNess leaves the house, she puts on a full face of makeup, including contouring, to make her features look more feminine and aligned with her gender identity. However, this approach is inadequate to treat her gender dysphoria, and she continues to confront daily emotional anguish because of her traditionally masculine facial features.

107.    On May 5, 2022, counsel for Ms. Zinner & Ms. VanNess sent a letter on their behalf to the DFA and a letter to the University of Tennessee on Ms. Zinner's behalf, inviting them to participate in alternative dispute resolution to address the individual and policy-wide coverage issues for medically necessary transgender-related care. The request did not result in removal of the Exclusion.

**D.** **Transgender People, Anti-transgender Discrimination, and Political Power**

108.    While transgender people have sometimes found acceptance in Tennessee as well as elsewhere in the country,[4] unfortunately, anti-transgender discrimination and violence remain rampant. Transgender people now face, and historically have faced, stigma, violence, and discrimination across all areas of life, including employment, housing, health care and education.

109.    A 2015 study showed that 21% of transgender respondents from Tennessee had lost a job due to their gender, more than one in four had experienced housing discrimination, one in three had experienced mistreatment from a healthcare provider, and 80% of those perceived as transgender while in a K-12 school experienced some form of gender-based mistreatment.[5]

110.    Trans people face high rates of violence. A 2022 study reported that 44% of LGBTQ youth in Tennessee had been threatened or harmed because of their gender identity or sexual orientation.[6] A 2019 study reported that 47% of trans people and 58% of trans women in the South experienced high levels of violence from strangers.[7]

---

[4] *See e.g., The Memphis Theater*, The Memphis Daily Appeal (October 26, 1875), https://www.digitaltransgenderarchive.net/files/h989r329k (accessed May 05, 2023) (praising a show involving "female impersonation"); Kristin M. Hall, *Pioneering transgender singer Jackie See e.g., The Memphis Theater*, The Memphis Daily Appeal (October 26, 1875), https://www.digitaltransgenderarchive.net/files/h989r329k (accessed May 05, 2023) (praising a show involving "female impersonation"); Kristin M. Hall, *Pioneering transgender singer Jackie Shane, a Nashville native, dies at 78*, The Tennessean (February 22, 2019), https://www.tennessean.com/story/entertainment/music/2019/02/22/jackie-shane-dies-transgender-singer-any-other-way-nashville/2953611002/ (Jackie Shane, a renowned Black trans R&B singer born in Tennessee in 1940, noting that she had the support of her mother and people at her school growing up).

[5] National Center for Transgender Equality, *2015 U.S. Transgender Survey: Tennessee State Report* (2017), https://transequality.org/sites/default/files/docs/usts/USTSTNStateReport(1017).pdf.

[6] The Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health: Tennessee* (2022), https://www.thetrevorproject.org/wp-content/uploads/2022/12/The-Trevor-Project-2022-National-Survey-on-LGBTQ-Youth-Mental-Health-by-State-Tennessee.pdf

[7] Transgender Law Center, *The Grapevine: A Southern Trans Report* (2019), https://transgenderlawcenter.org/wp-content/uploads/2019/05/grapevine_report_eng-FINAL.pdf

111.    Unfortunately, law enforcement violence against transgender people is also common, with 57% of transgender people in Tennessee who had interacted with a law enforcement officer who knew or suspected they were trans in the last year reporting some form of mistreatment.[8]

112.    Anti-transgender discrimination and violence has a long history in the United States and in Tennessee.[9]

113.    Transgender people make up around 1.6% of the U.S. adult population.[10] Transgender people are underrepresented in every branch of government. On information and belief, no openly transgender person has been elected to any public office in Tennessee, served in the United States Congress, or served as a federal judge.

114.    Nationwide and in Tennessee, transgender people lack political power and have been unable to translate public support into laws to protect themselves from discrimination.

---

[8] National Center for Transgender Equality, *2015 U.S. Transgender Survey: Tennessee State Report* (2017), https://transequality.org/sites/default/files/docs/usts/USTSTNStateReport(1017).pdf.

[9] *Reports*, Trans Lives Matter, https://tdor.translivesmatter.info/reports (last visited May 22, 2023) (listing murders of transgender people, including numerous murders of transgender people in Tennessee dating back to 1977); *State v. Moon*, No. C.C.A. 964, 1986 WL 13061, at *1 (Tenn. Crim. App. Nov. 19, 1986) (concerning rape of transgender person); *Gilland v. Owens*, 718 F. Supp. 665, 679 (W.D. Tenn. 1989) (noting targeting of feminine people for violence in men's jail); Amnesty International, *USA: Stonewalled: Police abuse and misconduct against lesbian, gay, bisexual and transgender people in the U.S.* (September 21, 2005), https://www.amnesty.org/en/documents/amr51/122/2005/en/ (noting widespread law enforcement abuse and misconduct against transgender people in cities throughout the U.S.); A Colored Man Who Successfully Passed as a Woman for 27 Years, The Milan Exchange (July 20, 1876), https://www.digitaltransgenderarchive.net/files/kp78gg70s (ridiculing a Black transgender disabled person sentenced to hard labor for not being able to afford a $50 fine); *Ledger Lines [5]*, Public Ledger (February 16, 1878), https://www.digitaltransgenderarchive.net/files/2z10wq56s (Black trans person fined $50 for wearing feminine clothing).

[10] *The Experiences, Challenges and Hopes of Transgender and Nonbinary U.S. Adults*, Pew Research (June 7, 2022), https://www.pewresearch.org/social-trends/2022/06/07/the-experiences-challenges-and-hopes-of-transgender-and-nonbinary-u-s-adults/

115. In the 2023 legislative session, states introduced over 500 anti-transgender or anti-LGBTQ bills. Many states passed laws criminalizing or restricting access to best-practice medical care for transgender young people, banning transgender girls from playing sports on girls' or women's teams, penalizing restroom use by transgender people, prohibiting acknowledgment of LGBT people in schools, or restricting the wearing of clothing not associated with one's assigned sex in public performance.

116. For at least its past seven sessions, the Tennessee legislature has considered numerous bills[11] that would mandate discrimination against transgender people in health care,

---

[11] *See, e.g.*, SB 0771/HB 0888 (Failed in Senate Education Committee on March 22, 2017) (would have required students in public schools to use restrooms and locker rooms assigned to persons of the same sex as shown on the students' birth certificates); SB2480/HB2620 (Failed in Senate Judiciary Committee on May 3, 2018. Taken off notice in House Finance, Ways & Means Subcommittee on May 9, 2018) (would have expanded the attorney general and reporter's duties to include representation of an LEA or certain LEA employees in a legal proceeding arising out of the LEA's adoption of a policy or practice designating multi-person restrooms, locker rooms, or other facilities for use based only on one's biological sex); SB 1297/HB 1151 (Signed May 2, 2019) (redefines "public place" for purposes of the offense of indecent exposure; includes a restroom, locker room, dressing room, or shower, designated for multi-person, single-sex use); SB 1499/HB 1274 (Referred the Senate State & Local Gov't Committee on May 1, 2019) (similar to SB 2480/HB 2620); SB 2215/ HB 2576 (Deferred in Senate Judiciary until Dec. 1, 2020) (would have classified providing gender affirming medical care to trans young people as child abuse unless two physicians and one board-certified child and adolescent psychiatrist certifies this care); SB 1736/HB 1689 (Action Deferred in Senate Until Dec. 1, 2020) (would have required that students participate in athletic teams consistent with their biological sex listed on birth certificate); SB 2077/ HB 1572 (Taken off notice on June 30, 2020) (would have required elementary and secondary schools that receive public funding to ensure that student athletes participate in school-sanctioned sports based on the student's biological sex as indicated on certificate issued at time of birth; provides for the cessation and restoration of the school's public funding); SB 1367/HB 1233 (Signed May 14, 2021) (Authorizing any student or employee who believes they have been in a restroom or locker room at the same time as a transgender student or employee to file a lawsuit against that school, which encourages schools to prohibit student use of bathrooms and locker rooms that match the student's gender identity); SB 2153/HB 2316 (Signed May 6, 2022) (Prohibiting transgender women from participating in women's college sports); SB 2696/HB 2835 (Taken off notice March 22, 2022) (would have had prevented trans kids from accessing crucial, medically necessary care); SB 0228/ HB 0360 (Taken off notice March 31, 2023) (Banning middle- and high-school trans athletes from playing sports in accordance with their gender identity); TN HB0009/ TN SB0003 (Signed May 2, 2023) (creates an offense for a person who engages in an adult cabaret performance on public property or in a location where the adult cabaret performance could be viewed by a person who is not an adult); TN HB0001/ TN SB0001 (Signed

education, and other vital aspects of life. This year, the Legislature passed at least four of them.[12]

## E. Defendants' Discriminatory Health Plans

### 1. Plan Selection and Administration

117.    Participating state employers and local education agencies delegate responsibility to the State, DFA, the State Committee, and LE Committee for the benefits provided to their employees.

118.    Through its "various departments, agencies, boards, and commissions of state government," the State pays 80% of the premiums for the State Plan. Tenn. Code Ann. § 8-27-203(a)(1). Through the Department of Education, the State pays a variable amount, as "specified in the general appropriations act," of the premiums for the Local Education Plan. Tenn. Code Ann. § 8-27-303(a)(1)(A).

119.    The State Committee and LE Committee, through their members, each approve the plans to be offered under the Program, including the State Plan and the Local Education Plan, and are ultimately responsible for determining the plans' "premiums, benefits package, funding method, administrative procedures, eligibility provisions, and rules." Tenn. Code Ann. § 8-27-202(a)-(b), 302(a)-(b). The State Committee and LE Committee are each responsible for plan design and for approving contracts with the insurance companies who act as claims administrators. The claims administrators perform certain administrative services for the Program, including

---

March 2, 2023) (prohibits healthcare providers from practicing gender affirming care for minors); TN HB0239/SB1440 (Signed May 17, 2023).

[12] The General Assembly has passed 5 bills that target transgender people. Of these, four have been signed by the governor. The first, HB0001/SB0001 prohibits doctors from providing life-saving, medically necessary healthcare to transgender minors. The second, HB0009/SB0003 targets drag performers and other gender-non-conforming people. The third, HB0306/SB1237 prohibits students from participating in school sports on teams that align with their gender identity. The fourth, HB0239/SB1440 defines sex inaccurately as "immutable" and "determined by anatomy and genetics existing at the time of birth," to the detriment of transgender and intersex people.

processing pre-authorization requests and claims. See Tenn. Code Ann. § 8-27-103. BCBST is the claims administrator for Ms. Zinner's plan and the plan in which Ms. VanNess was enrolled while employed by Knox County Schools.

120. The State Committee administers the Local Education Plan.

121. The State Committee Members and LE Committee Members at least annually approve changes to Program plan terms, including changes in benefits and premiums. In 2020, 2021, 2022, and 2023, the State and LE Committee members retained the Exclusion.

122. The DFA-specifically its Benefits Administration division, under the leadership of the DFA Commissioner-staffs the State Committee and LE Committee and performs certain administrative functions for the Program. Tenn. Code Ann. § 8-27-101(b). The State Committee and LE Committee may delegate to DFA administrative functions, including "the ability to resolve disputes regarding eligibility and enrollment for the plans and the benefit structure of the plans administered by those committees." Tenn. Code Ann. § 8-27-102. Upon information and belief, the State Committee and LE Committee each have in fact delegated these functions to the DFA.

123. The DFA is also charged with receiving discrimination and civil rights complaints related to the Program plans, receiving requests to continue dependent coverage, maintaining electronic versions of the member handbook, approving late applicants, approving qualifying events for voluntary coverage termination, receiving premium payments from covered surviving spouses and certain other plan participants, receiving elections for continued coverage under COBRA, receiving premium payments for COBRA coverage, receiving notification of possible third-party liability and facilitating subrogation, specific administrative duties, receiving and deciding enrollment and premium appeals and receiving notification and payment related to premium refunds.

124. Defendants University of Tennessee and Knox County Schools offer the State Plan and the Local Education Plan, respectively, to their employees. University of Tennessee, under the

leadership of President Randy Boyd, and Knox County Schools are each responsible for complying with Program regulations, and ensuring that their employees are able to participate in the Program, including by determining which of their employees meet eligibility requirements; providing enrollment materials, legal notices and plan documents; providing enrollment instruction and assistance; providing enrollment forms; deducting premiums from employees' paychecks, and paying a portion of employees' premiums.

125. University of Tennessee benefits staff, under the ultimate leadership of President Randy Boyd, provide assistance and information to employees regarding enrolling in the Program. Knox County Schools staff provide assistance and information to employees regarding enrolling in the Program.

126. On information and belief, Knox County Schools approves the terms of its participation in the Program and entered into a Memorandum of Understanding ("MOU") with DFA concerning its participation in the Program.

127. Knox County Schools employs an Agency Benefits Coordinator whose responsibilities include providing information about the Local Education Plan during new employee orientation, participating in calls with DFA Benefits Administration, providing annual trainings, data entry, fielding employee questions and working with DFA Benefits Administration on detailed questions, assisting with benefits-related events at DFA Benefits Administration's request, and facilitating communications between DFA Benefits Administration and Knox County Schools employees.

128. At least 127 local education agencies in Tennessee-approximately 85%-participate in the Program, including Knox County Schools. This includes at least 11, or more than 84%, of local education agencies surrounding Knox County.

### 2. The Program & the Exclusion's Design

129. The asserted purpose of the Program plans is to cover members' healthcare needs. The Program plans cover health care on broad terms, including mental health care, prescription drugs, laboratory testing, inpatient and outpatient surgery, primary care and specialist office visits, and hospital/facility services.

130. The Program's Exclusion prohibits coverage for "[s]urgery or treatment for, or related to, sex transformations or sexual dysfunctions or inadequacies, including penile prosthesis due to psychogenic impotence other than psychological treatment or counseling." The Exclusion eliminates coverage for otherwise covered treatments and surgeries when they are classified as "for, or related to, sex transformations," and as such, bars coverage for transgender-related health care. Thus, transgender-related surgeries are categorically excluded by the Program, regardless of medical necessity.

131. All plans within the Program contain the Exclusion.

132. The Program plans have contained the Exclusion, or its equivalent, since at least 2016.

133. The State Committee and the LE Committee have contracted with claims administrators, including BCBST, to process claims and perform other activities for the Program.

134. Since at least 2013, BCBST has recognized the general medical necessity of transgender-related healthcare in its corporate medical policy manual section on gender reassignment surgery. However, when there is a conflict between BCBST's guidelines and the terms of a Program plan, the terms of the Program plan govern.

135. Under the terms of the Program plans and BCBST's guidelines, transgender-related healthcare would be covered-but for the Exclusion. BCBST's guidelines provide criteria for coverage of breast augmentation and vaginoplasty. Though BCBST gender reassignment surgery

guidelines do not provide coverage criteria for transgender-related facial surgery, it is covered by the plain terms of the Program plans and thus would also be covered but for the Exclusion.

136.    Absent the Exclusion, claims for transgender-related care would be evaluated for medical necessity under BCBST's corporate medical policy and covered by Program plans in the same manner as any other claim for medical, mental health, or pharmacy benefits. Furthermore, absent the Exclusion, Plaintiffs would have the right to appeal any adverse determinations to BCBST and an independent review organization, which has the authority to find the care is medically necessary and reconsider or reverse the adverse determination.

137.    Nevertheless, due to the Exclusion, BCBST denies coverage for transgender-related surgeries regardless of medical necessity.

138.    The Program plans cover surgery and hormone replacement therapy as treatment for various other conditions when medically necessary, but exclude coverage for the same procedures when sought by transgender Program members for medically-necessary transgender care.

**F.    Defendants' Lack Legitimate Basis for the Exclusion, But Nonetheless Insist on Retaining It**

139.    On information and belief, personnel at DFA reconsidered but maintained the Exclusion following enactment of Section 1557 of the Patient Protection and Affordable Care Act and the promulgation of implementing regulations prohibiting discrimination in healthcare in 2016. In that year, upon information and belief, DFA leadership discussed beginning to cover transgender-related care but without publicizing the decision in Program plan documents or member handbooks, and while instructing service center and marketing teams to ignore questions about transgender-related care coverage.

140.    On July 8, 2020, DFA Director of Clinical Services Andrea Dowdy emailed BCBST and Cigna to ask for "information regarding costs and utilization of surgical procedures

for gender transitioning individuals." Ms. Dowdy's email references "multiple federal and [sic] court rulings to [sic] Section 1557."

141.    Rhonda Bynum, Account Executive for Corporate Accounts with BCBST, told Ms. Dowdy in or around July 2020 that based on 50 other self-funded group insurance plans, the cost to provide coverage of transgender-related care averaged $0.10 per member per month. On an annual basis, that would represent less than $350,000 in claims-related costs for the Program or approximately 0.04% of actual expenses incurred by the Program during the fiscal year ended June 30, 2021.

142.    The State Committee has discussed "premium holidays" for the purpose of "spend[ing] down excess reserves" on at least four occasions between 2020 and 2022.

143.    In November and December 2022, DFA prepared memoranda directing BCBST, among other claims administrators, to deny coverage because of the Exclusion for care sought for the diagnosis code F64 for "gender identity disorders," a diagnosis code that only applies to transgender patients seeking treatment for gender dysphoria. The memoranda does not provide any medical reason for denying coverage solely for this diagnosis.

144.    There is no medical or cost basis for the Exclusion.[13]

**G.    _Plaintiffs' Injuries_**

145.    Only transgender people experience gender dysphoria and seek transgender-related medical care. It is precisely because care is for transgender people related to gender transition that it is considered related to "sex transformation."

146.    Most transgender people seek some transition-related health care in their lifetimes.

---

[13] Cost, in any event, is not an important government interest nor is it available as a defense. _City of Los Angeles, Dep't of Water & Power v. Manhart_, 435 U.S. 702, 717 (1978) ("[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII.").

147.    Under the Program, care that would otherwise be covered as medically necessary is denied coverage solely because it is for a "sex transformation." Even the very same procedures that are covered when cisgender people need are denied to transgender people when needed because they are transgender. Thus, by design, the Exclusion affects only transgender people, and only because they are transgender.

148.    Health insurance benefits are a term, condition or privilege of employment and represent a material component of compensation. The Exclusion diminishes the value of Plaintiffs' health insurance benefits under the Program plans and singles out transgender people undergoing a gender transition for inferior compensation as compared to their colleagues.

149.    The Exclusion not only harms the health and finances of transgender people seeking gender dysphoria treatment, but it also reinforces the stigma attached to being transgender, having gender dysphoria, and seeking a gender transition. The Exclusion communicates to transgender persons and to the public that their state government deems them unworthy of equal treatment and the same coverage for medically necessary health care that all other employees receive in exchange for their work.

150.    As a result of the Exclusion, Plaintiffs were forced to delay medically necessary care, leaving them to suffer from inadequately-treated gender dysphoria.

151.    Ms. VanNess has been forced to pay out of pocket for medically necessary care that would have been covered but for the Exclusion.

152.    The discrimination Plaintiffs have suffered because of the Defendants' Exclusion has caused Plaintiffs ill health, financial hardship, distress, anguish, stress, and humiliation.

153.    Defendants' discrimination against Plaintiffs Zinner and VanNess continues as long as the Exclusion remains, barring Plaintiffs from medically-necessary healthcare.

**CAUSES OF ACTION**

**COUNT I: 42 U.S.C. § 1983 - Fourteenth Amendment Equal Protection**
**For Declaratory and Injunctive relief**

**Against the Commissioner of the Tennessee Department of Finance and Administration Jim Bryson, in his official capacity, on behalf of all Plaintiffs.**

**Against State Insurance Committee Members in their official capacities (Jim Bryson, David Lillard, Jason Mumpower, Carter Lawrence, Juan Williams, Bo Watson, Patsy Hazelwood, Michelle Consiglio-Young, Judi Knecht, Terry Carroll, and Holly Girgies), on behalf of Ms. Zinner & Ms. VanNess.**

**Against Local Education Insurance Committee Members in their official capacities (Jim Bryson, David Lillard, Jason Mumpower, Carter Lawrence, Maryanne Durski, Kristy Baddour, Erin Johnson, and Jennifer White), on behalf of Ms. VanNess.**

**Against University of Tennessee President Randy Boyd in his official capacity, on behalf of Ms. Zinner.**

**Against Knox County Schools on behalf of Plaintiff Ms. VanNess.**

154.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1 through 153 of this Complaint, as though fully set forth herein.

155.     42 U.S.C. § 1983 creates a private right of action in favor of any person whose constitutional rights have been violated by a person acting under color of state law.

156.     The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

157.     Defendants Commissioner of the Tennessee Department of Finance and Administration in his official capacity, State Insurance Committee Members in their official capacities, Local Education Insurance Committee Members in their official capacities, University of Tennessee President in his official capacity, and Knox County Schools each acted under color of law.

158. Classifications based on transgender status are subject to heightened scrutiny because they are based on sex and because transgender people belong to a discrete and insular minority.

159. The above Defendants'-Commissioner of the Tennessee Department of Finance and Administration in his official capacity, State Insurance Committee Members in their official capacities, Local Education Insurance Committee Members in their official capacities, University of Tennessee President in his official capacity, and Knox County Schools-adoption, maintenance, administration, and enforcement of the Exclusion, and offering Program plans with the Exclusion in them to their employees, have violated Plaintiffs' constitutional rights and have denied and continue to deny Plaintiffs equal protection of the laws, by intentionally discriminating against them on the basis of sex and transgender status. The Defendants' actions were not substantially related to any important government interest.

## COUNT II: Title VII of the Civil Rights Act

**Against Defendants the State of Tennessee, the State Insurance Committee, and the Department of Finance and Administration by both Plaintiffs.**

**Against Defendant the University of Tennessee, by Ms. Zinner.**

**Against Defendants Local Education Insurance Committee and Knox County Schools, by Ms. VanNess.**

160. Plaintiffs re-allege and incorporate the allegations in paragraphs 1 through 159 of this Complaint, as though fully set forth herein.

161. Title VII of the Civil Rights Act of 1964 prohibits an employer or agent thereof from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

162. Defendants the State of Tennessee, the State Insurance Committee, and the Department of Finance and Administration are Plaintiffs' employers or agents of their employers, as those terms are used in Title VII of the Civil Rights Act of 1964.

163. Defendant the University of Tennessee is Ms. Zinner's employer or agent of her employers, as those terms are used in Title VII of the Civil Rights Act of 1964.

164. Defendants the Local Education Insurance Committee and Knox County Schools are Ms. VanNess's employers or agents of her employers, as those terms are used in Title VII of the Civil Rights Act of 1964.

165. The above Defendants'-State of Tennessee, the State Insurance Committee, and the Department of Finance and Administration, the University of Tennessee, Local Education Insurance Committee, and Knox County Schools-adoption, maintenance, administration, and enforcement of the Exclusion, and provision of Program plans containing the Exclusion to employees, violates Title VII by intentionally providing lesser terms of compensation to transgender employees because of sex.

## COUNT III: Title IX of the Education Amendments

### Against Defendants the University of Tennessee, by Ms. Zinner, and Knox County Schools, by Ms. VanNess.

166. Plaintiffs re-allege and incorporate the allegations in paragraphs 1 through 165 of this Complaint as though fully set forth herein.

167. Title IX provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. The University of Tennessee and Knox County Schools are both education programs receiving federal financial assistance.

168. The University of Tennessee and Knox County Schools' adoption, maintenance, administration, and enforcement of Program plans containing the Exclusion violates Title IX by discriminating against and denying Plaintiffs and other transgender employees the full benefits of an education program or activity on the basis of sex.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that the Defendants' adoption, maintenance, administration, and enforcement of the Exclusion, and offering Program plans containing the Exclusion to employees, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972;

2.      Enjoin Defendants from any further enforcement or application of the Exclusion or any analogous future provision;

3.      Award Plaintiffs compensatory, consequential, and nominal damages in an amount to be determined at trial;

4.      Award pre-judgment and post-judgment interest at the highest lawful rate;

5.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses under 42 U.S.C. §§ 1988 and 2000e-5(k) or other applicable statutes; and

6.      Award Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of May, 2023.

/s/ J. Scott Hickman
Scott Hickman (No. 17407)
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Ave. South, Suite 1100
Nashville, TN 37201
Telephone: (615) 742-4200
Facsimile: (615) 742-4539
shickan@srvhlaw.com

*Attorneys for Plaintiffs*

/s/ Phillip F. Cramer
Phillip F. Cramer (No. 20697)
SPERLING & SLATER, LLC
150 3rd Ave. South, Suite 1100
Nashville, TN 37201
Telephone: (615) 742-4535
pcramer@sperling-law.com

*Attorneys for Plaintiffs*

/s/ Ezra Cukor
Ezra Cukor (PHV Motion pending)
Z Gabriel Arkles (PHV Motion pending)
Andrea Green (PHV Motion pending)
Shayna Medley (PHV Motion pending)
TRANSGENDER LEGAL DEFENSE
   AND EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: (646) 862-9396
Facsimile: (646) 993-1686
ecukor@transgenderlegal.org
garkles@transgenderlegal.org
agreen@transgenderlegal.org
smedley@transgenderlegal.org

*Attorneys for Plaintiffs*

/s/ Darren Teshima
Darren Teshima (PHV Motion pending)
Udit Sood (PHV Motion pending)
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
E-mail: DTeshima@cov.com
E-mail: USood@cov.com

Natalie Ritchie
(PHV Motion to be filed promptly
   upon receipt of Certificate of Good
   Standing)
Elaine H. Nguyen
(PHV Motion to be filed promptly
   upon receipt of Certificate of Good
   Standing)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
E-mail: NRitchie@cov.com
E-mail: ENguyen@cov.com

Robert Winson (PHV Motion pending)
Covington & Burling, LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
E-mail: RWinson@cov.com

*Attorneys for Plaintiffs*