IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GERDA ZINNER, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-00535 |
| | ) | |
| STATE OF TENNESSEE, ET AL. | ) | Judge Aleta A. Trauger |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS BY DEFENDANTS STATE OF TENNESSEE,
STATE INSURANCE COMMITTEE AND ITS MEMBERS,
LOCAL EDUCATION INSURANCE COMMITTEE AND ITS MEMBERS,
DEPARTMENT OF FINANCE AND ADMINISTRATION,
DFA COMMISSIONER JIM BRYSON,
UNIVERSITY OF TENNESSEE, AND UT PRESIDENT RANDY BOYD**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

BACKGROUND ...........................................................................................................................2

    A.  State of Tennessee Comprehensive Medical and Hospitalization Program ..........................2

    B.  Coverage Exclusion Affecting Plaintiffs ..............................................................4

STANDARDS OF REVIEW ........................................................................................................5

ARGUMENT ................................................................................................................................6

    I.        Zinner lacks standing to assert any claims against UT or President Boyd ...........................6

    II.      VanNess lacks standing to assert a § 1983 Equal Protection claim against
the State Defendants as any such claim is moot and barred by sovereign
immunity ...............................................................................................................7

    III.     Plaintiffs fail to state a plausible §1983 claim under the Equal Protection Clause ..............9

        A.  The Plans provide equal coverage to both sexes ........................................................9

        B.  Transgender individuals do not constitute a suspect class under the
Equal Protection Clause .............................................................................................12

        C.  The Exclusion satisfies judicial scrutiny .............................................................14

    IV.     Plaintiffs fail to state a plausible claim under Title VII ............................................16

        A.  Plaintiffs' Title VII claims are time-barred .............................................................16

            1.  Zinner failed to fie a charge with the EEOC within 180 days of receiving
notice that the State Plan excudes sex transformation surgery ...................................17

            2.  VanNess failed to file a charge with the EEOC within 180 days of receiving notice
that the State Plan excludes sex transformation surgery ..............................................19

        B.  Plaintiffs fail to establish a Title VII claim on the merits .........................................19

            1.  Plaintiffs were not treated differently than similarly situated employees ....................20

            2.  Plaintiffs have not pleaded facts demonstrating discriminatory intent ........................21

    V.      Zinner fails to state a plausible claim under Title IX .........................................................22

i

A. Zinner's Title IX claims are time-barred...............................................................................22

B. Zinner fails to establish a Title IX claim on the merits .......................................................22

CONCLUSION.................................................................................................................................25

CERTIFICATE OF SERVICE .......................................................................................................26

Case 3:23-cv-00535     Document 53     Filed 08/08/23     Page 3 of 37 PageID #: 354

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) .................................................................................. 14, 24

*Agema v. City of Allegan*,
  826 F.3d 326 (6th Cir. 2016) ........................................................................................6

*Amini v. Oberlin Coll.*,
  259 F.3d 493 (6th Cir. 2001) .................................................................................. 17, 19

*Armour v. City of Indianapolis, Ind.*,
  566 U.S. 673 (2012) ...................................................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 5, 19

*B.P.J. v. W. Va. St. Bd. of Educ.*,
  2023 WL 111875 (S.D. W.V. Jan. 5, 2023) ..................................................................25

*Banerjee v. Univ. of Tenn.*,
  820 F. App'x 322 (6th Cir. 2020) ........................................................................17, 18, 19

*Bannister v. Knox Cnty. Bd. of Ed.*,
  49 F.4th 1000 (6th Cir. 2022) ......................................................................................22

*Bassett v. National Collegiate Athletic Ass'n*,
  528 F.3d 426 (6th Cir. 2008) ........................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 5, 6, 19

*Bostock v. Clayton Cnty.*,
  140 S.Ct. 1731 (2020) ............................................................................................ 20, 24

*Broadway v. United Parcel Serv., Inc.*,
  499 F. Supp. 2d 992 (M.D. Tenn. 2007) ......................................................................17

*Brown v. Housing Authority of Tompkinsville*,
  2019 WL 2127324 (W.D. Ky. May 15, 2019) .................................................................8

*Carrier Corp. v. Outokumpu Oyj*,
  673 F.3d 430 (6th Cir. 2012) ........................................................................................5

Case 3:23-cv-00535    Document 53    Filed 08/08/23    Page 4 of 37 PageID #: 355

*Cataldo v. U.S. Steel Corp.*,
676 F.3d 542 (6th Cir. 2012) ........................................................................................22

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ..............................................................................................9, 12, 13

*Claybrook v. Birchwell*,
199 F.3d 350 (6th Cir. 2000) ........................................................................................8

*Courie v. Alcoa Wheel & Forged Prods.*,
577 F.3d 625 (6th Cir. 2009) ......................................................................................21

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*,
648 F.3d 365 (6th Cir. 2011) ........................................................................................9

*Davis v. Sodexho, Cumberland Coll. Cafeteria*,
157 F.3d 460 (6th Cir. 1998) ......................................................................................16

*Del. State Coll. v. Ricks*,
449 U.S. 250 (1980) ......................................................................................................18

*Diaz v. Mich. Dep't of Corr.*,
703 F.3d 956 (6th Cir. 2013) ........................................................................................8

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ..................................................................................................11

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................................................................8

*Fialka-Feldman v. Oakland Univ. Bd. of Trs.*,
639 F.3d 711 (6th Cir. 2011) ........................................................................................8

*Franciscan Alliance, Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ......................................................................24

*Gann v. Schramm*,
606 F. Supp. 1442 (D. Del. Apr. 18, 1985) ..............................................................11

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ..............................................................................................passim

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ......................................................................................................15

*Grandell v. Ohio Supreme Court*,
252 F.3d 828 (6th Cir. 2001) ........................................................................................8

iv

Case 3:23-cv-00535    Document 53    Filed 08/08/23    Page 5 of 37 PageID #: 356

*HDC, LLC v. City of Ann Arbor*,
675 F.3d 608 (6th Cir. 2012).................................................................................................21

*Heller v. Doe*,
509 U.S. 312 (1993)................................................................................................... 14, 15

*Hughes v. Sanders*,
469 F.3d 475 (6th Cir. 2006).....................................................................................................6

*Keys v. Humana, Inc.*,
684 F.3d 605 (6th Cir. 2012).................................................................................................19

*Klaassen v. Trustees of Indiana Univ.*,
24 F.4th 638 (7th Cir. 2022)....................................................................................................8

*Krei v. Nebraska*,
446 F. Supp. 3d 499 (D. Neb. Mar. 16, 2020)........................................................................8

*L.W. v. Skrmetti*,
73 F.4th 408 (6th Cir. July 8, 2023)...............................................................................passim

*Ladd v. Marchbanks*,
971 F.3d 574 (6th Cir. 2020)....................................................................................................8

*Lenox v. Healthwise of Ky., Ltd.*,
149 F.3d 453 (6th Cir. 1998).................................................................................................21

*Martin v. Masco Indus. Emps.' Benefit Plan*,
747 F. Supp. 1150 (W.D. Pa. 1990) ......................................................................................21

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976).................................................................................................................13

*Mathews v. Diaz*,
426 U.S. 67 (1976) ..................................................................................................................15

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021)..................................................................................................23

*Mitchell v. Toledo Hosp.*,
964 F.2d 577 (6th Cir. 1992)..................................................................................................20

*Mixon v. State of Ohio*,
193 F.3d 389 (6th Cir. 1999).....................................................................................................6

*Mullen v. Boyd Gaming Corp.*,
182 F.3d 914 (5th Cir. 1999)..................................................................................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ...................................................................................................................16

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ............................................................................................................ 17, 18

*Neese v. Becerra*,
2022 WL 16902425 (Nov. 11, 2022) ....................................................................................24

*New Eng. Health Care Emples. Pension Fund v. Ernst & Young, LLP*,
336 F.3d 495 (6th Cir. 2003) ....................................................................................................6

*Olivarez v. T-mobile USA, Inc.*,
997 F.3d 595 (5th Cir. 2021) ..................................................................................................20

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) .........................................................................................12, 13, 14

*Parks v. Reans*,
510 F. App'x 414 (6th Cir. 2013) .............................................................................................8

*Paterek v. Vill. of Armada, Michigan*,
801 F.3d 630 (6th Cir. 2015) ..................................................................................................10

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ....................................................................................................................25

*Plyler v. Doe*,
457 U.S. 201 (1982) ................................................................................................................10

*Reed v. Reed*,
404 U.S. 71 (1971) ....................................................................................................................9

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ............................................................................................................ 19, 21

*Rondigo, LLC v. Twp. of Richmond*,
641 F.3d 475 (6th Cir. 2011) ....................................................................................................6

*Rosa H. v. San Elizario Independent Sch. Dist.*,
106 F.3d 648 (5th Cir. 1997) ..................................................................................................23

*Saks v. Franklin Covey Co.*,
316 F.3d 337 (2d Cir. 2003) ...................................................................................................21

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017) ....................................................................................................................9

*Snyder-Hill v. Ohio State Univ.*,
  48 F.4th 686 (6th Cir. 2022)........................................................................................22

*Tennessee v. Dep't of Educ.*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ...................................................................13

*Tuan Anh Nguyen v. I.N.S.*,
  533 U.S. 53 (2001) ......................................................................................................11

*U.S. R.R. Ret. Bd. v. Fritz*,
  449 U.S. 166 (1980) ............................................................................................ 14, 15

*United States v. Virginia*,
  518 U.S. 515 (1996) ........................................................................................ 9, 11, 16

*Verizon Md. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ......................................................................................................8

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ....................................................................................................16

*Williams v. Kelly*,
  2018 WL 4386178 (E.D. La. Sept. 14, 2018)............................................................11

*Williams v. Kelly*,
  2018 WL 4403381 (E.D. La. Aug. 27, 2018) ............................................................11

*Williamson v. Lee Optical of Oklahoma Inc.*,
  348 U.S. 483 (1955) ............................................................................................ 14, 15

*Wood v. City of San Diego*,
  678 F.3d 1075 (9th Cir. 2012)....................................................................................21

*Wu v. Tyson Foods, Inc.*,
  189 F. App'x 375 (6th Cir. 2006) ...............................................................................17

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ....................................................................................................16

*Younis v. Pinnacle Airlines, Inc.*,
  610 F.3d 359 (6th Cir. 2010)......................................................................................16

*Zipes v. Trans World Airlines, Inc.*,
  102 S.Ct. 1127 (1982)..................................................................................................17

**Statutes**

20 U.S.C. § 1681.............................................................................................................. 1, 23, 24

Case 3:23-cv-00535     Document 53     Filed 08/08/23     Page 8 of 37 PageID #: 359

20 U.S.C. § 1686.................................................................................................................24

42 U.S.C. § 1983..............................................................................................................passim

42 U.S.C. § 2000e.............................................................................................1, 16, 17, 19

Cal. Penal Code § 819.......................................................................................................13

Minn. Stat. § 260.925.........................................................................................................13

Tenn. Code Ann. § 8-27-101......................................................................................... 2, 3

Tenn. Code Ann. § 8-27-203.......................................................................................... 3, 7

Tenn. Code Ann. § 8-27-302......................................................................................... 2, 3

Tenn. Code Ann. § 8-27-303...............................................................................................3

Tenn. Code Ann. § 8-27-702...............................................................................................2

Tenn. Code Ann. § 28-3-104.............................................................................................22

Tenn. Code Ann. § 68-33-101...........................................................................................15

U.S. Const. amend. XIV, § 1...............................................................................................9

U.S. Const. art. III, § 2 .......................................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(1).......................................................................................................3

Fed. R. Civ. P. 12(b)(6).......................................................................................................3

**Regulations**

34 C.F.R. § 106.37.............................................................................................................25

86 Fed. Reg. 7,023 (Jan. 20, 2021)...................................................................................13

**Other**

Webster, *American Dictionary of the English Language* (1865)...........................................10

Worcester, *A Dictionary of the English Language* (1860) ...................................................10

## INTRODUCTION

Plaintiffs Gerda Zinner and Story VanNess, who identify as transgender women, sought but were denied coverage for sex reassignment surgery under their State-sponsored health insurance plans based on an exclusion of coverage for "surgery or treatment for, or related to, sex transformations … other than psychological treatment or counseling." Compl. [Doc. 1] ¶130, PageID#26. Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 claiming this coverage exclusion unlawfully discriminates based on sex and transgender status, in violation of the guarantee of equal protection under the Fourteenth Amendment to the U.S. Constitution; Title VII, 42 U.S.C. § 2000e, et seq.; and Title IX, 20 U.S.C. § 1681, et seq. They seek declaratory, injunctive, and monetary relief.

No federal or state law requires employer-sponsored group health plans to cover all treatments sought by plan participants, even those considered medically necessary. And the health plans promulgated under the State of Tennessee Comprehensive Medical and Hospitalization Program do not, and cannot, do so. This case pits Plaintiffs' desire for coverage of desired medical procedures against one of their plans' many longstanding coverage exclusions. Plaintiffs improperly frame this exclusion as an unlawful classification of plan participants, rather than as a mere limitation of coverage benefits.

The plans at issue provide *every* participant, including Plaintiffs, the same health benefits to protect against the same health risks. And the categorical exclusion of coverage for "surgery or treatment for, or related to, sex transformations" applies to all participants, without regard to sex or any other trait. Plaintiffs present no facts demonstrating they are treated differently than similarly situated participants seeking treatment for gender dysphoria. There also is no indication the exclusion is the result of discriminatory intent. The exclusion does not constitute impermissible sex-based discrimination under the Equal Protection Clause, Title VII, or Title IX.

Many of Plaintiffs' claims are also barred on procedural grounds. Zinner lacks standing to assert any claims against the University of Tennessee ("UT") and UT President Randy Boyd due to

the absence of causation or redressability. VanNess lacks standing to assert a § 1983 equal-protection claim for declaratory and injunctive relief against the State Defendants because that claim is moot and barred by sovereign immunity. And Plaintiffs' claims under Title VII and Title IX are untimely.

Because Plaintiffs cannot possibly recover from these Defendants under any of the theories set forth in the Complaint, Defendants respectfully request the Court dismiss Plaintiffs' claims against them as a matter of law.

## BACKGROUND[1]

### A.     State of Tennessee Comprehensive Medical and Hospitalization Program

The State of Tennessee Comprehensive Medical and Hospitalization Program ("Program") provides health care benefits to 290,000 enrollees, including eligible public employees, retirees, and dependents. Compl., ¶6, PageID#2; Tenn. Code Ann. § 8-27-101, *et seq.* Statutorily-created insurance committees approve group health insurance plans offered under the Program, including the State Plan, Local Education Plan, and Local Government Plan. Compl. ¶¶27-30, PageID#5-6; Tenn. Code Ann. §§ 8-27-202, 8-27-302, 8-27-702. These insurance committees are authorized to determine the premiums, benefits package, funding method, administrative procedures, eligibility provisions, and rules relating to the group insurance plans they oversee. *Id.* The insurance committees also approve contracts with third-party insurance companies, such as BlueCross or Cigna, that act as claims administrators for each plan. *Id.* § 8-27-103(a). Although eligible employees may choose which third-party administrator they want to use, the scope of health benefits coverage is controlled by the approved

---

[1] Pin-cites to record materials reference the "PageID" numbers in the ECF file stamps. As required at the pleading stage, this Memorandum assumes the truth of the factual allegations in the complaint. Nothing in this Memorandum should be construed as an admission of fact.

Plan Document for each Plan. *See* State Plan Doc. (Ex. 1); Local Ed. Plan Doc (Ex. 2).[2] The Division of Benefits Administration of the Tennessee Department of Finance and Administration ("DFA") serves as staff to the insurance committees and performs administrative duties as the committees may delegate. Tenn. Code Ann. § 8-27-101(b), -(c).

Plaintiff Gerda Zinner is employed by the University of Tennessee ("UT") and chose to enroll in the State Plan approved by the State Insurance Committee and administered by BlueCross. Compl. ¶24, PageID#5. The State Plan is the only group insurance plan UT can offer its employees. *Id.* ¶33, PageID#7. The State funds 80 percent of the costs of benefits under the State Plan, with the remaining costs covered by member premiums. Tenn. Code Ann. § 8-27-203(a). Although UT makes the State Plan available to its employees, it does not determine or administer Plan benefits.

Plaintiff Story VanNess was formerly employed by Knox County Schools and was formerly enrolled in the Local Education Plan approved by the Local Education Insurance Committee and administered by BlueCross. Compl. ¶25, PageID#5. Benefits under the Local Education Plan are funded partly by the State and the members' local education agency, depending on legislative appropriations, and partly by member premiums.[3] Tenn. Code Ann. § 8-27-303(a). VanNess left Knox County Schools in July 2022 and is no longer enrolled in the Plan. Compl. ¶25, PageID#5.

The State Plan and the Local Education Plan provide an array of benefits available to all participants. Still, the Plans do not cover every medical treatment participants may want, including certain

---

[2] Defendants have attached the 2022 versions of the State Plan Document (Zinner) and the Local Education Plan Document (VanNess), both of which are referenced throughout the Complaint. Although the insurance committees approve new Plan Documents each year, there have been no material changes to the provisions at issue here during the relevant period. *See* Compl. ¶132, PageID#26.

[3] Local education agencies are not required to make the Local Education Plan available to their employees. Tenn. Code Ann. § 8-27-302(f). An agency may instead choose to provide its employees another health insurance plan with benefits "equal or superior to" those offered by the Local Education Plan, with the same manner of funding. *Id.* § 8-27-303(a)(2). Knox County Schools elected to participate in the Local Education Plan rather than offer an alternative plan of its own.

3

treatments considered medically necessary.  *See* Ex. 1; Ex. 2.  Both Plans exclude more than 50 categories of medical and mental health/substance abuse services from coverage.  Ex. 1, at 13.04(A); Ex. 2, at 13.04(A).  The Plans also exclude coverage for dental expenses, on-the-job injuries, and non-behavioral mental health/substance abuse expenses.  Ex. 1, at 13.04(B)-(D); Ex. 2, at 13.04(B)-(D).

If the Plan Document excludes a certain service, coverage for that service will be denied regardless of whether it is considered "medically necessary."  Ex. 1, at 13.01(A); Ex. 2, at 13.01(A).  Services must be included in the Plan for a claims administrator to conduct a "medical necessity" analysis to determine coverage.  *Id.*  And coverage for excluded services is denied regardless of the member's sex.  Ex. 1, at 13.01, 13.04; Ex. 2, at 13.01, 13.04.

### B.      Coverage Exclusion Affecting Plaintiffs

Plaintiffs are biological males who identify as transgender women.  Compl. ¶42, PageID#9.  They have been diagnosed with gender dysphoria, a psychological condition that refers to clinically significant distress from an incongruence between a person's biological sex and gender identity.  *Id.* ¶¶4, 44, PageID#2, 10.  Plaintiffs assert that while social transition and hormone therapy have been helpful, surgery is necessary to further alleviate the gender dysphoria they attribute to their naturally male physical characteristics.  *Id.* ¶¶61-63, 88-94, PageID#13, 16-17.  Zinner desires surgery to remove Zinner's male genitalia and to construct a vagina (vaginoplasty).  *Id.* ¶62, PageID#13.  VanNess has sought breast augmentation surgery and "facial feminization" surgery.  *Id.* ¶94, PageID#17.  But when Plaintiffs submitted requests to BlueCross for preauthorization of coverage for their requested surgeries, they were denied pursuant to the exclusion language contained in Plaintiffs' respective Plan Documents.  *Id.* ¶¶74, 77, 96-97, PageID#15, 18.

Both the State Plan and Local Education Plan have long excluded coverage for "[s]urgery or treatment for, or related to, sex transformations or sexual dysfunctions or inadequacies, including penile prosthesis[,] due to psychogenic impotence[,] other than psychological treatment or counseling"

4

("the Exclusion"). Ex. 1, at 13.04(A)(28); Ex. 2, at 13.04(A)(28).[4] BlueCross properly applied the Exclusion in denying Plaintiffs' requests for coverage of surgical "sex transformation."

The Exclusion applies equally to members of both sexes and without regard to transgender status. Coverage for "surgery or treatment for, or related to, sex transformations … other than psychological treatment or counseling" is excluded regardless of whether the requesting Plan member is male or female, transgender or not. *Id.* The Exclusion is based only on the *purpose* of the procedure—sex transformation—and not any other variable. *Id.* And because these services are excluded from coverage, requests for coverage are denied without any analysis of medical necessity. *Id.*

### STANDARDS OF REVIEW

#### A.      Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure asserts that a plaintiff lacks standing to bring a claim and, as a result, that the court lacks jurisdiction over the subject matter. A facial attack to subject-matter jurisdiction is governed by essentially the same standard as that applicable to a motion to dismiss brought under Rule 12(b)(6). *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

#### B.      Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Meeting this standard requires "more than the bare assertion of legal conclusions"; it requires "either direct or inferential allegations

---

[4] Plaintiffs' respective Plan Documents also exclude, subject to limited exceptions inapplicable here, "[c]harges incurred in connection with cosmetic surgery directed toward preserving or improving a patient's appearance," including rhinoplasty and "reconstructive surgery where no significant anatomic functional impairment exists." Ex. 1, at 13.04(A)(16); Ex. 2, at 13.04(A)(16). The procedures sought by Plaintiffs here would be considered cosmetic for nearly all other Plan members and would, therefore, be automatically excluded from coverage.

respecting all the material elements to sustain a recovery under *some* viable legal theory." *Hughes v. Sanders*, 469 F.3d 475, 477 (6th Cir. 2006) (quotation omitted). When a complaint fails to allege "*fact[s]*" that "raise the right to relief above the speculative level," *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555), defendants in federal court are "spar[ed] … a time-consuming and expensive discovery process." *Agema v. City of Allegan*, 826 F.3d 326, 332 (6th Cir. 2016). Moreover, this Court need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555, nor is the Court required to accept "unwarranted factual inferences," *Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

Documents attached to a motion to dismiss may be considered if they are referred to in the complaint and are central to the claims contained therein. *See Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court may also take judicial notice of public records. *See New Eng. Health Care Emples. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

## ARGUMENT

### I.  Zinner lacks standing to assert any claims against UT or President Boyd.

The U.S. Constitution restricts the jurisdiction of federal courts to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. To establish a case or controversy, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The causation element of standing demands that the injury be fairly traceable to the challenged action of a defendant, rather than the result of independent action by some third party. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). When the injury is caused by an unconstitutional rule of law, the proper defendant is the state official designated to enforce that rule. *Diamond v. Charles*, 476 U.S. 54, 64 (1986).

6

Although UT directs Zinner's day-to-day employment, it has no control over the State Plan in which Zinner is enrolled or the health benefits provided. Zinner admits the State Plan is the only group insurance plan that may be offered to UT employees. Compl. ¶33, PageID#7. UT does not determine the premiums, benefits package, funding method, administrative procedures, eligibility provisions, or rules for the State Plan, as those responsibilities are statutorily assigned to the State Insurance Committee. *Id.* ¶¶27-28, 119, PageID#5, 23; Ex. 1, at 1.06. UT also does not administer benefits provided under the State Plan, a responsibility delegated to third-party administrators contracted by the State Insurance Committee—which for Zinner is BlueCross. Compl. ¶119, PageID#23-24. UT is statutorily required to pay a certain portion of its employees' monthly premiums, and it has no authority to vary premium payments. Tenn. Code Ann. § 8-27-203(a)(1). Further, although UT may confirm employee eligibility for the State Plan, provide Plan materials to its employees, and deduct employee premium payments, Compl. ¶¶124-25, PageID#24-25, it does not determine which benefits are covered or excluded. And Zinner's only allegation against UT President Randy Boyd is essentially that UT falls under his leadership. *Id.* ¶¶34, 124-25, PageID#8, 24-25.

Zinner cannot trace causation for any alleged injury back to UT or President Boyd. And any injunctive relief issued against UT or President Boyd in this action would not redress Zinner's alleged injury, as neither have authority to provide the health benefits sought. As such, Zinner lacks standing to assert any claims against UT or President Boyd under § 1983, Title VII, or Title IX.

## II. VanNess lacks standing to assert a § 1983 Equal Protection claim against the State Defendants as any such claim is moot and barred by sovereign immunity.

VanNess asserts a § 1983 equal-protection claim against the DFA Commissioner, members of the State Insurance Committee, and members of the Local Education Insurance Committee, Compl. ¶¶157-59, PageID#30-31. A suit against State officials in their official capacities is equivalent to a suit against the State itself, and the State is entitled to sovereign immunity unless some exception to immunity applies. *See, e.g., Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000).

7

Although an official-capacity action seeking injunctive or declaratory relief may constitute an exception to sovereign immunity, *Ex parte Young*, 209 U.S. 123, 159-60 (1908), the Supreme Court has cautioned that *Ex parte Young* can only be used to avoid sovereign immunity when a "'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective,'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *accord Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011). Previous exposure to illegal conduct, by itself and without a showing of continuing and present adverse effects, "cannot establish standing for declaratory and injunctive relief." *Grandell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). *See also, e.g., Parks v. Reans*, 510 F. App'x 414, 415 (6th Cir. 2013) (prisoner's request for injunctive and declaratory relief was moot upon transfer to different facility); *Brown v. Housing Authority of Tompkinsville*, 2019 WL 2127324 (W.D. Ky. May 15, 2019) (dismissing plaintiff's claim for declaratory and injunctive relief as to former employer's allegedly discriminatory operating procedures as moot); *Klaassen v. Trustees of Indiana Univ.*, 24 F.4th 638, 640 (7th Cir. 2022) (dismissing students' challenges to vaccination requirement as moot after students had received religious exemptions or withdrawn from the university); *Krei v. Nebraska*, 446 F. Supp. 3d 499, 512 (D. Neb. Mar. 16, 2020) (request for injunctive and declaratory relief related to denial of coverage for sex transformation surgery was moot because the State no longer employed plaintiff). "Retroactive relief is barred by the Eleventh Amendment." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013).

Because VanNess is neither employed by Knox County Schools nor enrolled in the Local Education Plan, the relief VanNess seeks is based merely on alleged past harm. Accordingly, VanNess lacks standing to assert a § 1983 equal-protection claim against the State Defendants for declaratory and injunctive relief because that claim is moot and barred by sovereign immunity. And because VanNess cannot recover any other relief from these Defendants pursuant to § 1983, that claim should be dismissed in its entirety.

8

### III.    Plaintiffs fail to state a plausible § 1983 claim under the Equal Protection Clause.

The Equal Protection Clause guarantees that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiffs claiming an equal-protection violation must "adequately plead" that: (1) "the government treated [them] disparately" compared to "similarly situated" individuals and (2) "such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citation omitted). Plaintiffs fail to satisfy either prong.

#### A.    The Plans provide equal coverage to both sexes.

Sex discrimination under the Equal Protection Clause means "giv[ing] a mandatory preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971); *accord United States v. Virginia*, 518 U.S. 515, 547 (1996) (applying heightened scrutiny to such sex-based preferences). These classifications allocate the "benefits and burdens between the sexes in different ways." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985); *accord Virginia*, 518 U.S. at 532-33.

The Exclusion at issue applies equally to both sexes and "does not prefer one sex to the detriment of the other." *See L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. July 8, 2023). It does not "[p]rescrib[e] one rule for" men and "another for" women. *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). There is "no risk from which men are protected and women are not," or vice versa. *Geduldig v. Aiello*, 417 U.S. 484, 497 (1974). Under the Exclusion, coverage is denied for "surgery or treatment for, or related to, sex transformations," regardless of whether the requesting participant is male or female. The Exclusion is sex-neutral.

In a recent opinion instructive here, the Sixth Circuit held that a state law prohibiting healthcare providers from providing puberty blockers and cross-sex hormones to minors for the purpose of sex reassignment likely does not constitute sex discrimination under the Equal Protection Clause because the law "applies to all minors, regardless of their biological birth with male or female

sex organs." *L.W.*, 73 F.4th at 408 (staying district court's preliminary injunction against enforcement of state law). The same goes for the Exclusion at issue here, which applies equally to all Plan participants without regard to any particular trait.

Plaintiffs' Complaint conflates sex with transgender status. But the term "gender identity" did not exist in 1868 at the ratification of the Fourteenth Amendment. Americans understood "gender," when used outside of a grammatical context, as a synonym for "sex." *See, e.g.*, Webster, *American Dictionary of the English Language* (1865) (defining the noun "gender" as "Sex, male or female"); Worcester, *A Dictionary of the English Language* (1860) (same).

Nonetheless, Plaintiffs assert that the Exclusion draws a distinction based on transgender status by arguing that non-transgender individuals can obtain coverage for "the same care that is denied to transgender employees" because non-transgender individuals who request "these treatments" do not do so for the purpose of "sex transformations." Compl. ¶11, PageID#3. But under equal-protection analysis, "similarly situated" individuals "must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 650 (6th Cir. 2015); *Plyler v. Doe*, 457 U.S. 202, 216 (1982) ("The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."). Plaintiffs—who identify as transgender women and have been diagnosed with gender dysphoria—fail to identify a comparator similarly situated in all relevant respects.

Plaintiffs wrongly suggest that medical procedures used to treat one condition should be considered "the same procedures" when used to treat other conditions. Compl. ¶138, PageID#27. But a procedure effective for one diagnosis often has a different purpose and different risks when used to treat another. For example, there is a significant difference between a mastectomy used to remove cancerous tissue and a mastectomy used to remove *perfectly healthy* tissue that a patient says is causing psychological distress. So too with cross-sex hormones. The Sixth Circuit recently rejected the idea that a procedure given to one sex for the purpose of sex transformation is automatically the same

procedure when provided to the opposite sex for a different purpose. *L.W.*, 73 F.4th at 408 (observing that only biological women can transition using testosterone, while only biological men can transition with estrogen). A State's recognition that a certain procedure has a different purpose and different risks depending on a person's biological sex "does not require skeptical scrutiny." *Id.* The "[p]hysical differences between men and women . . . are enduring." *Virginia*, 518 U.S. at 533. "To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001).

Thus, similarly situated persons for the purposes of Plaintiffs' equal-protection claim are other Plan members with the same diagnosis of gender dysphoria. *See, e.g. Williams v. Kelly*, 2018 WL 4403381 at \*12. (E.D. La. Aug. 27, 2018) (dismissing equal-protection claim of gender-dysphoric plaintiff denied a sex-transforming vaginoplasty where plaintiff presented no facts demonstrating disparate treatment compared to other prisoners with gender dysphoria) (adopted by *Williams v. Kelly*, 2018 WL 4386178 (E.D. La. Sept. 14, 2018)); *see also Gann v. Schramm*, 606 F. Supp. 1442, 1447 (D. Del. Apr. 18, 1985) ("[A] function of medical diagnosis is to determine in what ways individuals are *not similarly situated* so that they can be treated accordingly. Such rationally based differentiation clearly does not violate the equal protection clause."). Plaintiffs fail to present any facts whatsoever demonstrating such disparate treatment.

The Exclusion's implication of biological sex proves nothing because "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022) (quoting *Geduldig*, 417 U.S. at 496 n.20). Plaintiffs fail to set forth any facts establishing such animus toward either sex or transgender individuals. At best, Plaintiffs merely allege the Exclusion has existed for years and that State officials have "refused and/or ignored Plaintiffs' requests" to remove it from the

Program.  Compl. ¶¶17, 132, PageID#4, 26.  That is not evidence of intentional, invidious discrimination.  Rather, State officials "are constitutionally free to include or exclude" surgeries and other treatment for the purpose of sex transformation "on any reasonable basis."  *Geduldig*, 417 U.S. at 496 n.20.  Challenges "related to the asserted underinclusiveness of the set of risks that the State has selected to insure" are subject to rational basis review.  *Id.* at 494-95.

**B.  Transgender individuals do not constitute a suspect class under the Equal Protection Clause.**

Building on their improper assertion that the Exclusion discriminates based on transgender status, Plaintiffs assert that "[c]lassifications based on transgender status are subject to heightened scrutiny."  Compl. ¶158, PageID#31.  But even if the Exclusion did draw distinctions based on transgender status—which it does not—"neither the Supreme Court nor [the Sixth Circuit] has recognized transgender status as a quasi-suspect class" in the equal-protection context, and the Sixth Circuit recently declined the invitation to do so.  *L.W.*, 73 F.4th at 408.  Accordingly, "rational basis review applies to transgender-based classifications."  *Id.*  That is consistent with the Sixth Circuit's decision in *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015), which held that gay persons do not constitute a quasi-suspect class.  Unlike "race or biological gender," sexual orientation is not "definitively ascertainable at the moment of birth."  *Id.*  So too for transgender status.  *See* Compl. ¶57, PageID#12 ("Ms. Zinner began to tell her family and friends that she is transgender" at age 18), ¶84, PageID#16 ("Ms. VanNess first told others that she is transgender in her early 20s.").

Even if the Sixth Circuit had not foreclosed Plaintiffs' invitation to recognize a new quasi-suspect class, the bar for doing so is high.  *L.W.*, 73 F.4th at 408.  The Supreme Court has recognized only two such classes.  *Cleburne*, 473 U.S. at 441 (gender and illegitimacy).  It "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so."  *Ondo*, 795 F.3d at 609; *see also Cleburne*, 473 U.S. at 442 (mental disability is not a quasi-suspect class); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (age is not a quasi-suspect class).

In declining to recognize transgender individuals as a quasi-suspect class, the Sixth Circuit observed that "[g]ender identity and gender dysphoria pose vexing line-drawing dilemmas for state legislatures" and that removing "these trying policy choices" from state policymakers to the federal judiciary is not how a constitutional democracy works best, particularly "when confronting evolving social norms and innovative medical options." *L.W.*, 73 F.4th at 408.

Plaintiffs cannot satisfy the high bar for recognizing a new quasi-suspect class under the requirements set forth in *Cleburne.* For example, the actions of the Biden Administration are inconsistent with Plaintiffs' contention that transgender individuals "lack political power." Compl. ¶114, PageID#21; *see also Cleburne*, 473 U.S. at 445. From his first day in office, President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). His agencies have attempted to impose new gender identity obligations on the States. *See, e.g., Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838 39 (E.D. Tenn. 2022) (rejecting agency attempts to "go[] beyond the holding of *Bostock*"). President Biden has "appointed a record number of openly LGBTQI+ leaders," including a Senate-confirmed transgender admiral and a non-binary Deputy Assistant Secretary for the Office of Nuclear Energy. White House, *A Proclamation on Transgender Day of Visibility* (Mar. 30, 2023), perma.cc/VZN6-4ATC. The mere fact that a group constitutes a minority of officeholders or the nation's total population does not mean it lacks political power. In many States, transgender individuals have convinced legislatures to take the unprecedented step of prohibiting recognition of child custody orders when a custodial parent does not want these treatments performed on a gender-dysphoric child. *See L.W.*, 73 F.4th at 408 (citing Cal. Penal Code § 819 and Minn. Stat. § 260.925 as two such examples).

But even if transgender individuals did constitute a quasi-suspect class, the Exclusion does not discriminate based on transgender status. Plaintiffs acknowledge that not all transgender individuals experience gender dysphoria, and not all seek surgery or other treatment for sex transformation.

13

Compl. ¶43, 50-51, PageID#9, 11. Thus, transgender individuals are in "both" the group of individuals receiving the treatments excluded from coverage and in the group not receiving such treatments. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022). The "fiscal and actuarial benefits of the [Plan] thus accrue to members of both sexes," as well as to those who identify as transgender and those who don't. *Geduldig*, 417 U.S. at 496 n.20. As such, there is a "lack of identity" between transgender status and the excluded treatments. *Id.* (finding no sex discrimination for exclusion of disability benefits related to pregnancy because, although every pregnant person is female, "members of both sexes" are in the nonpregnant group).

### C. The Exclusion satisfies judicial scrutiny.

As discussed above, the Exclusion at issue is subject to rational-basis review. Under this standard, "the government's actions enjoy a 'strong presumption of validity.'" *Ondo*, 795 F.3d at 608 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). So much so that States need not "articulate its reasons" for taking government action. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). Accordingly, the Court may presume that the Exclusion is constitutional if "there are plausible reasons for [the government] action." *Id.* The challenged Exclusion easily satisfies rational-basis review.

There are several plausible reasons upon which State policymakers "might have concluded" that the Plans fared better without covering "surgery or treatment for, or related to, sex transformations … except for psychological treatment or counseling." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 487 (1955). For one, sex-transforming surgical and hormonal treatments are still often considered "new" or "experimental," and "the medical and regulatory authorities are not of one mind" about using the excluded procedures "to treat gender dysphoria." *L.W.*, 73 F.4th at 408. Policymakers also reasonably could have concluded that off-label uses of FDA-approved drugs for the purpose of sex transformation "present[ed] unacceptable dangers." *Id.* (citing Tenn. Code Ann. § 68-33-101(b), -(e), -(g)). Policymakers also might have concluded that "other helpful, less risky, and non-

14

irreversible treatments remain available" for treating gender dysphoria, *id.* (citing Tenn. Code Ann. § 68-33-101(c)), including "psychological treatment or counseling," which *are* covered by the Plans. States have wide discretion to regulate in areas, like this one, "where 'medical and scientific uncertainty' exists." *Id.* (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). And while Plaintiffs attempt to downplay the potential costs to Plan members of eliminating the challenged Exclusion, Compl. ¶141, PageID#28, there is no question that a totally comprehensive program would increase costs to the State, which has a legitimate interest in maintaining the self-supporting nature of the Program, keeping benefit payments for covered services at an adequate level, and maintaining the contribution rate at a reasonable level for participants. *Geduldig*, 417 U.S. at 495-96; Compl. ¶6, PageID#2. The foregoing are all plausible reasons for the Exclusion. Plaintiffs cannot "negative every conceivable basis which might support [the Exclusion]," as is required to overcome rational-basis review. *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (quoting *Heller*, 509 U.S. at 320).

Further, even if some consider the excluded treatments "medically-necessary," Compl., ¶¶4, 11, PageID#2-3, "the law need not be in every respect logically consistent with its aims to be constitutional." *Williamson*, 348 U.S. at 487-88. This premise is particularly true where State officials "must necessarily engage in a process of line-drawing," *Fritz*, 449 U.S. 166, 179 (1980), such as in "[t]he task of classifying persons for medical benefits," *Mathews v. Diaz*, 426 U.S. 67, 83 (1976). Defining coverage "inevitably requires" the placement of claims "on different sides of the line." *Id.* The same applies here. State policymakers engaged in selective placement, differentiating between those medical conditions and procedures they chose to insure and those they did not. This selection process did not involve an "arbitrary line" that divided Plan enrollees "between two classes." *Yick Wo v. Hopkins*, 118 U.S. 356, 368 (1886). The State's "line" not only excludes "[s]urgery or treatment for, or related to, sex transformations," but it also excludes coverage for treatment of "sexual dysfunctions or inadequacies, including penile prosthesis due to psychogenic impotence" (Ex. 1, at 13.04(A)(28); Ex. 2, at

13.04(A)(28))—as well as dozens of other excluded services listed in the Plan Documents (Ex. 1, at 13.04(A); Ex. 2, at 13.04(A). Again, the State is not required to fund every non-emergency procedure participants may want.

Ultimately, medical insurance, like education, "is not a 'one size fits all' business." *Virginia*, 518 U.S. at 542; *accord Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 553 (2012) (recognizing that an individual's health may dictate the scope of their insurance coverage needs). As mentioned above, "[g]ender identity and gender dysphoria pose vexing line-drawing dilemmas." *L.W.*, 73 F.4th at 408. But a constitutional democracy demands that policy choices occur in the "arena of public debate and legislative action." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Thus, the policy choices written into the Program's Plan Documents are for State policymakers—and not the judiciary—to decide.

## IV. Plaintiffs fail to state a plausible claim under Title VII.

Plaintiffs' Title VII claims are time barred. But even if they were not, Plaintiffs have failed to present facts sufficient to establish a Title VII claim against these Defendants on the merits.

### A. Plaintiffs' Title VII claims are time-barred.

A person aggrieved by allegedly discriminatory employment practices must exhaust their administrative remedies by timely filing an administrative charge with the EEOC or an equivalent state agency before bringing a Title VII claim. *See* 42 U.S.C. § 2000e-5(e)(1); *See also, e.g.*, *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361-62 (6th Cir. 2010); *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). In Tennessee, if the plaintiff initially files a charge with the Tennessee Human Rights Commission ("THRC") or dual-files with the EEOC and THRC, the charge is timely if made within 300 days of the allegedly unlawful employment action. *See* 42 U.S.C. § 2000e-5(e)(1). If the plaintiff initially files a charge only with the EEOC, the charge is timely if made within 180 days of the alleged unlawful employment action. *Id.*

16

The administrative charge period "is functionally equivalent to a statute of limitations." *Zipes v. Trans World Airlines, Inc.*, 102 S.Ct. 1127, 1132 – 1134 (1982). Courts routinely dismiss Title VII discrimination claims that stem from alleged unlawful employment actions filed outside the administrative charge period. *See Wu v. Tyson Foods, Inc.*, 189 F. App'x 375 (6th Cir. 2006); *Banerjee v. Univ. of Tenn.*, 820 F. App'x 322, 330-32 (6th Cir. 2020); *Broadway v. United Parcel Serv., Inc.*, 499 F. Supp. 2d 992 (M.D. Tenn. 2007). Dismissal on that basis is warranted here.

### 1. Zinner failed to file a charge with the EEOC within 180 days of receiving notice that the State Plan excludes sex transformation surgery

Zinner filed charges of sex discrimination with the EEOC on August 22, 2022. Compl. ¶38, PageID#9. As the Complaint does not mention a dual-filed complaint with THRC, the 180-day administrative charge period applies. *See* 42 U.S.C. § 2000e-5(e)(1).

Zinner admits receiving notice by at least June 12, 2020, that the State Plan in which Zinner was enrolled excluded coverage for sex-transformation surgery. Compl. ¶¶62-64, PageID#13 (describing phone call with BlueCross). Three days later, Zinner received a letter from BlueCross at Zinner's request again confirming that "gender reassignment surgery isn't covered under your plan." *Id.* ¶¶64-65, PageID#13. Notification to Zinner of the Exclusion triggered the 180-day administrative charge period because "the starting date for the [administrative charge period] is when the plaintiff learns of the [allegedly unlawful] employment decision itself." *Amini v. Oberlin Coll.*, 259 F.3d 493 (6th Cir. 2001). Because Zinner waited more than two years from the alleged act of discrimination to file charges with the EEOC, Compl. ¶38, PageID#9, Zinner's Title VII claim is time barred.

Significantly, Zinner does not allege any discrete acts of discrimination by any of these Defendants during the 180-day administrative charge period that would make the charge timely. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (discrete acts of discrimination include easy-to-identify actions, such as termination, failure to promote, denial of transfer, or refusal to hire). Plaintiffs acknowledge the Exclusion of surgical sex transformation has remained a part of the State Plan since

17

June 2020.  Compl. ¶¶68-74, 132, PageID#14-15, 26.  Zinner cannot restart the clock by later requesting coverage for the same sex-transformation surgery after receiving notice of its exclusion under the State Plan.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("the filing limitations periods therefore commenced [ ] at the time" the "decision was made and communicated to" the plaintiff, "even though one of the *effects* of the" decision "did not occur until later"); *see also Banerjee*, 820 F. App'x at 330-32 (Title VII limitations period began to run at least upon plaintiff receiving notice of future termination by letter despite later initiation of internal appeals process).  Subsequent denials of coverage cannot be "independently discriminatory" acts because the decision to exclude coverage had already been made.  *Ricks*, 449 U.S. at 113.

Even if the annual approval of the Plan Document constituted a separate and discrete act of putative discrimination, Zinner knew that each Plan Document excluded coverage for sex transformation surgery more than 180 days before Zinner filed charges of discrimination with the EEOC on August 22, 2022.  Plaintiff learned of the 2020 Plan Document's exclusion of sex transformation surgery by at least June 12, 2020.  Compl., ¶64, PageID#13.  Zinner learned in October 2020 that the 2021 Plan Document included the same Exclusion.  *Id.* ¶¶68-69, PageID#14.  And in August 2021, in response to an inquiry from Zinner, UT's Executive Director of Payroll, Benefits, and Retirement advised Zinner that the State Insurance Committee had no plans to remove the Exclusion from the 2022 Plan Document.  *Id.* ¶¶70-72, PageID#14.  Zinner received confirmation by at least November 2021 that the 2022 State Plan Document excluded coverage for surgical sex transformation.  *Id.* ¶74, PageID#15.  Zinner did into file charges until well more than 180 days later.

### 2.    VanNess failed to file a charge with the EEOC within 180 days of receiving notice that the State Plan excludes sex transformation surgery

VanNess filed a charge of sex discrimination with the EEOC on August 18, 2022.  Compl., ¶40, PageID#9.  As the Complaint does not mention a dual-filed complaint with THRC, the 180-day administrative-charge period applies.  *See* 42 U.S.C. § 2000e-5(e)(1).

The administrative-charge period began to run when BlueCross notified VanNess by letter dated October 29, 2021, denying VanNess' request for coverage of surgical sex transformation. Compl., ¶97, PageID#18; *see Amini*, 259 F.3d 493 (holding that the charge period starts to run when the employee is notified of the allegedly unlawful employment decision.). Although VanNess later appealed the coverage determination, Compl., ¶101, PageID#18, that did not toll the administrative charge period. *Banerjee*, 820 F. App'x at 330-32. VanNess did not file a charge of discrimination until almost ten months later, well after the 180-day limitations period had expired. Compl., ¶40, PageID#9.

## B. Plaintiffs fail to establish a Title VII claim on the merits

Even if Plaintiffs' Title VII claims are not time-barred, they still fail on the merits for reasons similar to their equal-protection claims. Title VII discrimination claims require a "plausible" pleading to survive a Rule 12 motion to dismiss. *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (citing *Twombly*, 550 U.S. at 557). Plaintiffs can satisfy "plausibility" only by alleging "sufficient factual content from which a court, informed by its judicial experience and common sense, could draw the reasonable inference" that Defendants "discriminated against [Plaintiffs] with respect to [their] compensation, terms, conditions, or privileges of employment *because of*" their sex. *Id.*, 684 F.3d at 610 (citing *Iqbal*, 556 U.S. at 678, 679) (cleaned up). Plaintiffs must also establish that "the defendant had a discriminatory intent or motive." *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Plaintiffs neither present facts demonstrating they were treated less favorably than similarly situated Plan members, nor do they establish that Defendants acted with the requisite discriminatory intent.

### 1. Plaintiffs were not treated differently than similarly situated employees.

Plaintiffs must prove that a "comparable non-protected person was treated better" by establishing "at a minimum … (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell v.*

19

*Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).  In this case, Plaintiffs contend that Defendants discriminated against them based on their transgender status by opting not to cover "surgery or other treatment for, or related to, sex transformations … other than psychological treatment or counseling." Compl. ¶¶11, 130, 138, PageID#3, 26-27.  However, as previously discussed, this Exclusion applies equally to all participants without consideration of any participant trait because the excluded service is simply not a covered benefit under the Plan Documents.  Moreover, any transgender enrollee of either sex who applies for coverage of a medical treatment or procedure to change their sex will be denied, regardless of their biological sex.  Compl., ¶9, PageID#3 ("The Exclusion . . . bars coverage for transgender *people*") (emphasis added).

The Exclusion of coverage for sex transformation surgery, therefore, complies with *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020).  For both Plaintiffs, "changing the employee's sex" would not have "yielded a different choice."  *Id.*, at 1741; *see also Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 598 (5th Cir. 2021) (affirming grant of motion to dismiss where plaintiff "failed to allege employer would have behaved differently toward an employee with a different gender identity").  Coverage for sex-transformation surgery would be denied pursuant to the Exclusion regardless of whether Plaintiffs are male or female, transgender or not.  The Exclusion applies universally.  Plaintiffs have not presented any facts demonstrating they were treated differently than other Plan members seeking treatment for gender dysphoria.  That is fatal to Plaintiffs' Title VII claims.

It is also irrelevant under Title VII whether the excluded services sought by Plaintiffs are medically necessary.  Employers generally have substantial flexibility under Title VII to decide which healthcare services to cover, and health insurance plans routinely exclude coverage of medically necessary procedures.  *See, e.g., Saks v. Franklin Covey Co.*, 316 F.3d 337, 348-49 (2d Cir. 2003) (excluding medically necessary surgical impregnation); *Mullen v. Boyd Gaming Corp.*, 182 F.3d 914, 914 (5th Cir. 1999) (excluding medically necessary weight loss treatment); *Lenox v. Healthwise of Ky., Ltd.*, 149 F.3d

453, 454 (6th Cir. 1998) (excluding organ transplants); *Martin v. Masco Indus. Emps.' Benefit Plan*, 747 F. Supp. 1150, 1153-54 (W.D. Pa. 1990) (excluding medically necessary breast reduction).  Regardless of medical necessity, Title VII requires neither of Plaintiffs' Plans to cover sex transformation surgery because the Exclusion applies without regard to sex or any other trait.  *See Saks*, 316 F.3d at 349 ("Because the Plan's exclusion of coverage for surgical impregnation procedures limits the infertility procedures for male and female employees equally, that exclusion does not violate Title VII.").

### 2. Plaintiffs have not pleaded facts demonstrating discriminatory intent.

Title VII discrimination occurs only where an employer has treated a particular person less favorably than others "because of" a protected trait; therefore, Plaintiffs' success is contingent on whether they can establish Defendants acted with "discriminatory intent."  *Ricci*, 557 U.S. at 577.  "A complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations does not sufficiently show entitlement to relief."  *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608 (6th Cir. 2012); *accord Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009).

Plaintiffs fail to present any facts whatsoever addressing discriminatory intent.  Plaintiffs point out that the subject Exclusion has been included in the relevant Plan Documents for years, Compl. ¶132, PageID#26, and that Zinner unsuccessfully requested that the Exclusion be removed, *id.* ¶¶68, 70, 73, PageID#14.  But, as previously discussed, the fact that State officials have not removed the Exclusion in response to Zinner's requests does not plausibly suggest that the adoption and maintenance of the Exclusion were motivated by intent to discriminate against a protected class.  *See Wood v. City of San Diego*, 678 F.3d 1075, 1081-82 (9th Cir. 2012) (merely being "aware" male employees would disproportionately benefit from a policy is not sufficient to show the requisite discriminatory intent).  Of course, UT and President Boyd have nothing to do with determining Plan benefits at all.

Insurance programs like the State Plan and Local Education Plan do not provide "lesser terms of compensation," Compl. ¶165, PageID#32, simply due to the "underinclusiveness of the set of risks

that the State has elected to insure." *Geduldig*, 417 U.S. at 494. Plaintiffs' mere conclusory allegation of discriminatory intent, Compl. ¶159, PageID#31, is insufficient and fatal to their Title VII claims.

## V. Zinner fails to state a plausible claim against UT under Title IX.

Even if Zinner had standing, Zinner's Title IX claim against UT is time barred. Zinner also has failed to present facts establishing a plausible Title IX claim on the merits.

### A. Zinner's Title IX claim is time-barred.

In Tennessee, the statute of limitations for Title IX claims is one year. *Bannister v. Knox Cnty. Bd. of Ed.*, 49 F.4th 1000, 1013 (6th Cir. 2022); *see also* Tenn. Code. Ann. § 28-3-104(a)(1). A Title IX claim accrues when a plaintiff "knows or has reason to know that they were injured and that the defendant caused their injury." *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 704 (6th Cir. 2022). Dismissal is warranted where, as here, "the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citation omitted).

As discussed above, Zinner was notified no later than June 2020 that the State Plan excluded coverage for "surgery or treatment for, or related to, sex transformations" except for psychological treatment or counseling. Compl. ¶¶ 64-65, 130 PageID#13, 26. At that point, Zinner knew of the alleged injury (denial of coverage) and the cause of that injury (coverage exclusion in the State Plan). DFA and UT personnel confirmed to Zinner again in October 2020 and August 2021, respectively, that the Exclusion remained part of the State Plan and that the State Insurance Committee had no plans to remove it. *Id.* ¶¶68-72, PageID#14. And Zinner received confirmation by November 2021 that the 2022 State Plan still excluded coverage for surgical sex transformation. *Id.* ¶74, PageID#15. Zinner filed suit on May 24, 2023, long past the expiration of the one-year limitations period.

22

### B. Zinner fails to establish a Title IX claim on the merits.

Title IX prohibits "discrimination under any education program or activity receiving Federal financial assistance," such as UT, "on the basis of sex." 20 U.S.C. § 1681(a). Zinner has failed to present sufficient facts to establish a plausible Title IX claim.

As previously discussed, the benefits and exclusions set forth in the State Plan in which Zinner was enrolled apply universally to *all* Plan participants, regardless of whether the participant is male or female. Zinner does not identify any benefit available to men but not to women, or vice versa. Rather, the Complaint simply states that the sex-transformation surgeries that Plaintiffs seek would be covered "but for the exclusion" against them. Compl. ¶135, PageID#26-27. But that alone does not make the Exclusion discriminatory. The Program contains numerous other exclusions of services that participants may want, including treatment for infertility, treatment for sexual dysfunctions, procedures to correct poor eyesight, hearing aids, and experimental cancer drugs, all of which are universally excluded. Ex. 1, at 13.04(A). Zinner has not alleged any facts showing that the Exclusion discriminates based on sex any more so than others in the State Plan.

To the extent Zinner attempts to assert that the Exclusion violates Title IX by "discriminating against … transgender individuals," Compl. ¶168, PageID#32, Zinner fares no better. The protection afforded to transgender status under Title VII does not necessarily extend to Title IX. The Sixth Circuit has recognized that "Title VII differs from Title IX in important respects" and that "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see also Rosa H. v. San Elizario Independent Sch. Dist.*, 106 F.3d 648, 657 (5th Cir. 1997) ("[W]e should be reluctant to treat Title IX's antidiscrimination provisions in the same way that we treat Title VII's provisions."). The Supreme Court agrees. In *Bostock*, the Court expressly limited its holding to terminations based on transgender status. *Bostock*, 140 S.Ct. at 1753 ("The only question before us is whether an employer who fires someone

23

simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"). The *Bostock* Court noted that questions regarding Title IX "are for future cases, not these." *Id.*

Title IX's language and history also provide good reason to distinguish its "on the basis of sex" language from Title VII's "because of sex" language. *See Neese v. Becerra*, 2022 WL 16902425 (Nov. 11, 2022) ("As written and commonly construed, Title IX operates in binary terms —male and female—when it references 'on the basis of sex.'"); *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016) ("[T]he text, structure, and purpose reveal that the definition of sex in Title IX's prohibition on sex discrimination unambiguously prevented discrimination on the basis of biological differences between males and females."). Many parts of Title IX and its regulations use binary language inconsistent with gender identity. For example, 20 U.S.C. § 1681(a)(2) discusses certain institutions which change "from being an institution which admits students of only one sex to being an institution which admits students of both sexes." Similarly, § 1681(a)(8) indicates that if certain "activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex." In contrast, gender identity encompasses a multitude of statuses and identities. *See* Compl. ¶43, PageID#9-10 (identifying "gender identity" as "male, female, or some other category").

Acknowledging differences between the sexes does not equate to discrimination "on the basis of sex." In fact, Title IX allows or even *requires* institutions to consider sex in accommodations. For example, under Title IX, universities may take sex into account in "maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *see also Adams*, 57 F.4th at 813 ("If sex were ambiguous, it is difficult to fathom why the drafters of Title IX went through the trouble of providing an express carve-out for sex-separated living facilities, as part of the overall statutory scheme."). Under Title IX regulations, universities *must* consider sex when allocating athletic scholarships. 34 C.F.R.

24

§ 106.37(c)(1). Similarly, a man may be denied participation on a women's athletic team, regardless of how he expresses himself, due to the biological differences between men and women. *B.P.J. v. W. Va. St. Bd. of Educ.*, 2023 WL 111875 (S.D. W.V. Jan. 5, 2023) (law limiting participation in women's athletics to biological girls does not violate Title IX). Thus, unlike the Supreme Court's interpretation of "because of sex" under Title VII, discrimination under Title IX is not a "but for" test—Title IX contemplates permissible scenarios where "changing the [plaintiff's] sex would have yielded a different choice by the [defendant]."

Extending sex discrimination under Title IX to transgender status also may violate the Spending Clause, under which Title IX was enacted. "The legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the contract." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (quotations omitted). If "Congress intends to impose a condition on the grant of federal moneys" as it did under Title IX, "it must do so unambiguously." *Id.* Title IX's protections do not "unambiguously" extend to transgender status.

But even if Title IX's protections do extend to transgender status, it would make no difference here. As previously discussed, the Exclusion of coverage for surgical sex transformations is applied to participants equally, regardless of their sex or transgender status. A request for coverage of sex transformation surgery under the State Plan would be denied regardless of whether the person requesting it identifies as transgender or not. Zinner's Title IX claim is without merit.

## CONCLUSION

For all the foregoing reasons, these Defendants respectfully request the Court to grant their motion and to dismiss each of Plaintiffs' claims against them as a matter of law.

25

Dated: August 8, 2023

Respectfully submitted,

*/s/ Steven J. Griffin*
Steven J. Griffin (Bar No. 40708)
Ryan N. Henry (Bar No. 40028)
Reed N. Smith (Bar No. 40059)
Brooke A. Huppenthal (Bar No. 40276)
 Assistant Attorneys General
OFFICE OF THE TENNESSEE ATTORNEY
GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202-0207
Phone: 615-741-9598
steven.griffin@ag.tn.gov
ryan.henry@ag.tn.gov
reed.smith@ag.tn.gov
brooke.huppenthal@ag.tn.gov

*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2023, the undersigned filed the foregoing document using the Court's Electronic Court-Filing system, which sent notice of filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
| --- | --- |
| Ezra Cukor<br>Z. Gabriel Arkles<br>Andrea Green<br>Shayna Medley<br>Transgender Legal Defense and Education Fund, Inc.<br>520 8th Ave, Ste. 2204<br>New York, NY 10018<br>Telephone: (646) 862-9396<br>Facsimile: (646) 993-1686<br>ecukor@transgenderlegal.org<br>garkles@transgenderlegal.org<br>agreen@transgenderlegal.org<br>smedley@transgenderlegal.org<br><br>J. Scott Hickman (No. 17407)<br>Sherrard Roe Voigt & Harbison, PLC<br>150 3rd Ave. South, Suite 1100<br>Nashville, TN 37201<br>Telephone: (615) 742-4200<br>Facsimile: (615) 742-4539<br>shickan@srvhlaw.com<br><br>Phillip F. Cramer (No. 20697)<br>Sperling and Slater, LLC<br>150 3rd Ave. South, Suite 1100<br>Nashville, TN 37201<br>Telephone: (615) 742-4535<br>pcramer@sperling-law.com<br><br>Darren Teshima<br>Udit Sood<br>Covington & Burling, LLP<br>Salesforce Tower<br>415 Mission Street, Suite 5400<br>San Francisco, California 94105-2533<br>Telephone: (415) 591-6000<br>Facsimile: (415) 591-6091 | Counsel for Plaintiffs |

27

| | |
|---|---|
| E-mail: DTeshima@cov.com<br>E-mail: USood@cov.com<br><br>Natalie Ritchie<br>Elaine H. Nguyen<br>Covington & Burling, LLP<br>One CityCenter<br>850 Tenth Street, NW<br>Washington, D.C. 20001-4956<br>Telephone: (202) 662-6000<br>Facsimile: (202) 778-5465<br>E-mail: NRitchie@cov.com<br>E-mail: ENguyen@cov.com<br><br>Robert Winson<br>Covington & Burling, LLP<br>1999 Avenue of the Stars, Suite 3500<br>Los Angeles, CA 90067-4643<br>Telephone: (424) 332-4800<br>Facsimile: (424) 332-4749<br>E-mail: RWinson@cov.com | |
| David M. Sanders (Bar No. 016885)<br>Jessica Jernigan-Johnson (Bar No. 032192)<br>Knox County, Tennessee<br>400 W. Main St., Suite 612<br>City-County Building<br>Knoxville, Tennessee 37902<br>Telephone: 865-215-3236<br>Facsimile: 865-215-2936<br>David.Sanders@knoxcounty.org<br>Jessica.Johnson@knoxcounty.org | Counsel for Defendant Knox County Board of Education |

Respectfully submitted,

*/s/ Steven J. Griffin*
STEVEN J. GRIFFIN