**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| GERDA ZINNER, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:23-cv-00535 |
| | ) | |
| | ) | Judge Aleta A. Trauger |
| THE STATE OF TENNESSEE, ET AL., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

---

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

---

## <u>TABLE OF CONTENTS</u>

I.        INTRODUCTION ................................................................................................... 1

II.      LEGAL STANDARD.............................................................................................. 2

III.    ARGUMENT ......................................................................................................... 3

      A.     *BOSTOCK* AND *NEWPORT NEWS*, NOT *SKRMETTI*, CONTROL

              PLAINTIFFS' TITLE VII CLAIMS. ...................................................... 3

      B.     *SKRMETTI* DOESN'T CHANGE THAT THE EXCLUSION FACIALLY

              DISCIMINATES BECAUSE OF SEX. .................................................. 7

      C.     UNLIKE THE PETITIONERS IN *SKRMETTI*, PLAINTIFFS ALSO ALLEGE

              AMPLE FACTS SUPPORTING AN INFERENCE OF DISPARATE

              TREATMENT BASED ON CIRCUMSTANTIAL EVIDENCE. ........................ 9

      D.     *SKRMETTI* DOES NOT CHANGE THAT PLAINTIFFS ALSO STATE A

              CLAIM BASED ON SEX STEREOTYPING. .................................................... 12

      E.     THE FACTS THAT UNDERPINNED *SKRMETTI'S* CONCLUSION THAT SB1

              CLASSIFIED BASED ON AGE AND MEDICAL USE ARE ABSENT HERE.

              .................................................................................................................. 13

IV.    CONCLUSION..................................................................................................... 14

CERTIFICATE OF SERVICE .................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ames v. Ohio Dep't of Youth Servs.*,
605 U.S. 303 (2025).....................................................................................1, 4, 6, 7, 9

*Amos v. Lampo Group, LLC*,
No. 24-5011, 2024 WL 3675601 (6th Cir. August 6, 2024)....................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................2, 11

*Bostock v. Clayton County*,
590 U.S. 644 (2020)............................................................................................... *passim*

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)......................................................................................................4

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978).............................................................................................3, 7, 12

*Cohens v. State of Virginia*,
19 U.S. 264 (1821)........................................................................................................3

*Davis v. Prison Health Servs.*,
679 F.3d 433 (6th Cir. 2012) .....................................................................................11

*Day v. Wayne Cnty. Bd. of Auditors*,
749 F.2d 1199 (6th Cir. 1984) .....................................................................................3

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) ...................................................................................8, 12

*General Electric Co. v. Gilbert*,
429 U.S. 125 (1976)......................................................................................................5

*Geduldig v. Aiello*,
417 U.S. 484 (1974)......................................................................................................5

*Hart v. Hillsdale County*,
973 F.3d 627 (6th Cir. 2020) .....................................................................................11

*Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., et al.,*
*v. Johnson Controls*,
499 U.S. 187 (1991)...................................................................................................7, 9

*Lee v. Vanderbilt Univ.*,
No. 22-5607, 2023 WL 4188341 (6th Cir. June 22, 2023) ................................................2, 10

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
462 U.S. 669 (1983) ...........................................................................................3, 5, 6, 7, 14

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 ...........................................................................................................................4

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971) ..............................................................................................................6

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) ..............................................................................................................4

*Reeves v. Sanderson Plumbing Products, Inc*,
530 U.S. 133 (2000) ..............................................................................................................9

*Savel v. MetroHealth Sys.*,
96 F.4th 932 (6th Cir. 2024) .....................................................................................2, 10, 11

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) .....................................................................................8

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) ..............................................................................................12

*Snider v. Jefferson State Cmty. Coll.*,
344 F.3d 1325 (11th Cir. 2003) ............................................................................................3

*Toth v. City of Toledo*,
480 F. App'x 827 (6th Cir. 2012) ........................................................................................3

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) ................................................................................................ *passim*

*Washington v. Davis*,
426 U.S. 229 (1976) ..............................................................................................................3

*Wright v. Spaulding*,
939 F.3d 695 (6th Cir. 2019) ................................................................................................4

**Statutes**

42 U.S.C. 2000e-2(a) .........................................................................................................3, 4

42 U.S.C. 2000e(k) ................................................................................................................3

Tenn. Code Ann. §§ 68-33-102 (3), (5), (8) ......................................................................13

Tenn. Code Ann. § 68-33-103(b)....................................................................................................14

v

# I.    INTRODUCTION

Plaintiffs state a claim for discrimination because of sex in violation of Title VII, for the reasons stated in Plaintiffs' Consolidated Memorandum of Law in Opposition to Motion to Dismiss by Defendants. Doc. 101.[1] Specifically, Plaintiffs seek coverage for health care supported by the leading medical associations and recognized as medically necessary by Defendants' own third party administrators. Doc. 89 ¶¶ 57-64, 171-75, 180-81. Defendants' exclusion of "sex transformations" (the "Exclusion") withdraws coverage of otherwise-covered medically necessary treatments and procedures from Ms. Zinner, Ms. VanNess, and Ms. Hamel, but not their cisgender (non-transgender) colleagues, because of their sex.

The Supreme Court's narrow ruling in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), on the application of the Equal Protection Clause to SB1 has no bearing on Plaintiffs' claims. In *Skrmetti*, the Supreme Court considered an Equal Protection challenge to Tennessee Senate Bill 1 (SB1), which regulates the use of puberty blockers and hormones for children and adolescents under age 18 depending on diagnosis. *Id.* at 1826–27. Here, Plaintiffs assert only Title VII claims against enforcement of the Exclusion; therefore, Title VII case law governs this case. The text of Title VII and binding Supreme Court precedent prohibit any reliance on sex in employment decisions, including offering unequal benefits because of sex. *Bostock v. Clayton County*, 590 U.S. 644, 656–662 (2020); *Skrmetti*, 145 S. Ct. at 1834 (citing *Bostock* as the standard for Title VII claims); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309–10 (2025). Contrary Equal Protection decisions do not control.

---

[1] Since this case was stayed in September 2024, Plaintiffs have all unenrolled in the Program and, therefore, dismissed without prejudice their Equal Protection and Title IX claims. *See* Doc. 131 (Order on Consent Motion).

*Skrmetti* does not, and cannot, change the analysis for Plaintiffs' Title VII claims for at least four reasons. First, the Exclusion, as alleged, explicitly discriminates because of sex in violation of Title VII. Second, though not required because the Exclusion is a facially discriminatory policy, Plaintiffs amply allege facts supporting an inference of sex discrimination based on circumstantial evidence. Third, Plaintiffs allege Defendants' Exclusion discriminates based on sex stereotypes. Fourth, the Exclusion at issue here is materially different from SB1—it is based on sex and there is no factual basis to conclude it is based on age or medical use. And even if the Exclusion were to incorporate a diagnosis of gender dysphoria, both gender dysphoria and "sex transformation" are exact proxies for transgender status in this context. As explained in detail below, each of these reasons independently suffices to state a claim under Title VII. The Court should deny Defendants' motions to dismiss.

## II.    LEGAL STANDARD

Unlike in *Skrmetti*, which examined a factual record in the context of a preliminary injunction, Plaintiffs are at the pleading stage. Accordingly, the allegations in the Amended Complaint must be taken as true and, construed in the light most favorable to the plaintiffs, need only support a plausible inference of sex discrimination. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see, e.g.*, *Savel v. MetroHealth Sys.*, 96 F.4th 932, 942–44 (6th Cir. 2024) (reversing dismissal of Title VII claims involving alleged religious discrimination); *Lee v. Vanderbilt Univ.*, No. 22-5607, 2023 WL 4188341, at *3 (6th Cir. June 22, 2023) (reversing dismissal of gender and retaliation claims).

## III. ARGUMENT

### A. *BOSTOCK* AND *NEWPORT NEWS*, NOT *SKRMETTI*, CONTROL PLAINTIFFS' TITLE VII CLAIMS.

*Skrmetti* only considered Equal Protection claims and does not disturb applicable Title VII precedent. 145 S. Ct. at 1834. Congress and the Supreme Court have already determined that providing unequal employment benefits because of sex is unlawful. Unlawful Employment Practices, Employer Practices, 42 U.S.C. § 2000e-2(a); Unlawful Employment Practices, Businesses or Enterprises with Personnel Qualified on Basis of Religion, Sex, or National Origin; Educational Institutions with Personnel of Particular Religion, 42 U.S.C. § 2000e(k); *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983). Moreover, discriminating against an employee for being transgender is prohibited sex discrimination under Title VII. *Bostock*, 590 U.S. at 683; *see also* Doc. 101 at 15-16. *Skrmetti* does not disturb this precedent.

Equal Protection claims and Title VII claims run independently. *Toth v. City of Toledo*, 480 F. App'x 827, 831 (6th Cir. 2012) (citing *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984)) (noting Title VII, not the Constitution, covers retaliation for filing an EEOC charge). They are not identical. *See Washington v. Davis*, 426 U.S. 229, 238–39 (1976) ("We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today."); *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328–29 (11th Cir. 2003) ("Title VII originally was created to reach conduct that the Constitution did *not* reach.").

*Skrmetti's* observation that even under the reasoning of *Bostock* SB1 would not merit heightened scrutiny only applies in the Equal Protection context. *See* 145 S. Ct. at 1834–35. To the extent that the Court commented on *Bostock's* Title VII analysis, that is *dicta* and not controlling.

*See Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821) ("If [expressions of the court in the opinion] go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."); *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) ("[O]nly holdings are binding, not dicta.").

Equal Protection jurisprudence reconciles "the principle of equal protection with the reality of legislative classification." *Skrmetti*, 145 S. Ct. at 1828. Virtually all legislation involves line-drawing, and the Equal Protection clause applies not just to the government in its capacity as an employer, but to all manner of government actions. Accordingly, the Court has devised Equal Protection tests that account for legislative authority, with varying levels of scrutiny based on whether a suspect or quasi-suspect classification is at issue. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441–42 (1985). *Skrmetti* thus incorporated the Equal Protection Clause's deference to legislative classifications. 145 S. Ct. at 1836.

In Title VII cases, by contrast, the judiciary's role is to apply Congress's duly enacted statute—a statute that commands "[g]ender must be irrelevant to employment decisions." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("[Title VII] strike[s] at the entire spectrum of disparate treatment of men and women in employment.") (citation omitted). "[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 590 U.S. at 669. Further, "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms." *Id.* at 674. It is not for the courts to add exceptions to statutory text: "Congress left no room for courts to impose special requirements." *Ames*, 605 U.S. at 310.

*Skrmetti* does not disturb Title VII's text or precedent establishing expansive protections against sex discrimination. Title VII makes it unlawful for an employer "to discriminate against

4

any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). *Skrmetti* concluded that SB1 drew lines based on age and medical condition, reasoning even though "some medical treatments and procedures are uniquely bound up in sex," classifications based on those treatments are not necessarily sex classifications triggering heightened scrutiny in the Equal Protection context. 145 S. Ct. at 1829. However, *Bostock*, interpreting Title VII, held that an employer who discriminates against an employee because she is transgender discriminates based on sex because transgender status is "inextricably bound up with sex" and thus "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Bostock*, 590 U.S. at 660–61. That is because "[a]s enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them." *Id.* at 670.

Skrmetti also relied on the reasoning of *Geduldig v. Aiello*, 417 U.S. 484 (1974), which both Congress and the Supreme Court have confirmed has no bearing on Title VII claims. *Skrmetti*, 145 S. Ct. at 1833–34; *Newport News*, 462 U.S. at 678–79, 684. In *Geduldig,* the Court reasoned there was a "lack of identity" between pregnancy and sex classifications because the two groups created by a pregnancy classification—pregnant and non-pregnant people—both contained women. 417 U.S. at 496–97 n.20. The Court extended *Geduldig* to the Title VII context thereafter. *General Electric Co. v. Gilbert*, 429 U.S. 125, 136 (1976).

But Congress and the Supreme Court have since unequivocally rejected *Geduldig* and *Gilbert's* application of *Geduldig* to Title VII. Congress responded by enacting the Pregnancy Discrimination Act ("PDA"), which amended Title VII. In *Newport News*, the Court acknowledged Congress's repudiation of both *Gilbert* and *Geduldig* for all Title VII claims: "When Congress

5

amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News*, 462 U.S. at 678–79, 684. The Court determined the PDA had rejected the "test of discrimination employed" in *Gilbert* not only as to pregnant employees, but as to "all individuals [subject to] sex discrimination in employment," including the male plaintiffs in the *Newport News* case. *Id*. at 676, 681.

*Newport News* also explained why *Geduldig* and *Gilbert's* reasoning was especially inapt in the insurance context. Because the nature of insurance is protection against "future risks rather than historic facts," excluding pregnancy disadvantaged not only people who had been or were presently pregnant but everyone who might need coverage for a pregnancy in the future. *Id.* at 678 ("It was inaccurate to describe the program as dividing potential recipients into two groups, pregnant women and non-pregnant persons . . . Rather, the appropriate classification was 'between persons who face a risk of pregnancy and those who do not.'").

*Bostock* recently reaffirmed the Court's wholesale rejection of *Geduldig* and *Gilbert's* reasoning for Title VII claims. The Court emphasized that discrimination against someone for being gay or transgender relies on sex even though it could affect people of more than one sex and would not affect everyone of the same sex—that is, people of the same sex fell on both sides of the line. *Bostock*, 590 U.S. at 658–60, 667–69. In doing so, *Bostock* hewed to the original meaning of Title VII. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543–44 (1971). This term the Court again affirmed that Title VII protects all individuals evenhandedly, rather than drawing lines at the group level. *Ames*, 605 U.S. at 310 (citing *Bostock*, 590 U.S. at 659).

*Skrmetti* neither changes nor casts doubt on the application of Title VII's prohibition on sex discrimination to this case. Rather, *Skrmetti* and *Ames* reinforce that *Bostock* sets the standard for Title VII claims. *Skrmetti*, 145 S. Ct. at 1834 (reiterating *Bostock's* holding that firing someone for

being gay or transgender violates Title VII). As the Supreme Court observed: "'[F]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex' . . . . In such a case, the employer has penalized a member of one sex for a trait or action that it tolerates in members of the other." *Id.* (quoting *Bostock*, 590 U.S. at 662); *Ames*, 605 U.S. at 309–10.

### B. *SKRMETTI* DOESN'T CHANGE THAT THE EXCLUSION FACIALLY DISCIMINATES BECAUSE OF SEX.

Where, as here, an employer maintains an "explicit gender-based policy," the terms of the policy control. *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., et al., v. Johnson Controls*, 499 U.S. 187, 199–200 (1991). Doc. 101 at 18-19. Accordingly, *Skrmetti* does not change the fact that Plaintiffs plausibly allege that Defendants' prohibition of coverage for "sex transformations" facially discriminates because of sex.

To determine whether an employer discriminates because of sex in violation of Title VII, one need only apply the "simple test" of "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different." *Manhart*, 435 U.S. at 711 (citation omitted); *Bostock*, 590 U.S. at 656; *Newport News*, 462 U.S. at 679–84 (finding that the health insurance plan violated Title VII because the plan would treat a male employee with dependents "in a manner which but for that person's sex would be different"). "Often, events have multiple but-for causes," but "a defendant cannot avoid liability just by citing some *other* factor." *Bostock*, 590 U.S. at 656. The employee's sex being a but-for cause—even one of many—is enough to trigger Title VII. *Id.* It makes no difference if other factors also contribute to the outcome. *Id.* at 661. "For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms." *Id.* at 662.

Here, as Plaintiffs allege, the Exclusion fails the simple test and deprives them of coverage because of their sex. The Exclusion blocks coverage only when health care is classified as a "sex transformation." Doc. 89 ¶¶ 9-12, 166, 185. The answer to whether care is classified as "sex transformation" depends on the sex the employee was labeled at birth. Doc. 89 ¶¶ 181, 183-85. Changing that variable therefore changes whether the Exclusion applies. Ms. Zinner, Ms. VanNess, and Ms. Hamel all sought medications and surgical procedures that are included in the Program and all meet the medical necessity criteria for coverage. Doc. 89 ¶¶ 69, 73-75, 79-84, 87-89, 92, 101, 104-05, 111-18, 123-26, 130-31, 135-41. Because they were identified as male at birth and the health care they sought modifies their bodies to produce physical sex characteristics traditionally associated with people who were identified as female at birth, however, the Exclusion bars coverage. Doc. 89 ¶¶ 85-89, 91-93, 113-15, 118, 123-24, 136-37, 140-41, 166, 171-75, 180-81, 183, 185. Change Plaintiffs' assigned sex at birth to female and the result changes: the Exclusion would be no barrier to coverage. Doc. 89 ¶¶ 12-13, 166, 172-75, 181, 185. That is, the Exclusion does *not* block coverage for a cisgender woman who seeks the same medically necessary procedures that are included in the Program and would modify her body in a way traditionally associated with people who were identified as female at birth. *Id.*

The Exclusion, therefore, does more than "reference" sex. *Skrmetti*, 145 S. Ct. at 1829. It *depends* on sex. As alleged it determines whether coverage is allowed or barred based at least in part on sex. Doc. 101 at 15-18. An Exclusion for "sex transformations" is meaningless without relying on an individual employee's sex. Doc. 101 at 15-16. "[T]ry writing out instructions for" implementing the Exclusion "without using the words man, woman, or sex []. It can't be done." *Bostock*, 590 U.S. at 668–69. A person cannot be penalized for seeking to or having transformed their sex without relying on the sex they were identified to be at birth. *See EEOC v. R.G. & G.R.*

*Harris Funeral Homes, Inc.*, 884 F.3d 560, 575 (6th Cir. 2018) ("[D]iscrimination 'because of sex' inherently includes discrimination against employees because of a change in their sex."); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306–08 (D.D.C. 2008) (refusal to hire an employee because "she planned to change her anatomical sex by undergoing sex reassignment surgery was *literally* discrimination 'because of . . . sex.'"). Femininizing hormones or surgical procedures such as vaginoplasty and mammaplasty would not be "sex transformation" for women who were deemed female at birth, but they are for women like Plaintiffs because they were deemed male at birth. Doc. 89 ¶¶ 12, 166, 172-75, 181, 185.

### C. UNLIKE THE PETITIONERS IN *SKRMETTI*, PLAINTIFFS ALSO ALLEGE AMPLE FACTS SUPPORTING AN INFERENCE OF DISPARATE TREATMENT BASED ON CIRCUMSTANTIAL EVIDENCE.

Because Defendants' Exclusion discriminates on its face, no additional proof of discriminatory intent is necessary. *Johnson Controls*, 499 U.S. at 199–200; *see* Doc. 101 at 15-19; *supra* § III.B. However, Plaintiffs' Amended Complaint also independently alleges a plausible inference of sex discrimination based on circumstantial evidence. Doc. 89 ¶¶ 9-20, 166-82, 199-205; Doc. 101 at 15-19.

Under Title VII, absent an employment policy that discriminates on its face, an employee may prove disparate treatment through circumstantial evidence of discrimination, which can (but need not) include evidence of animus or that the employer's purported non-discriminatory reasons were pretext for discrimination. *Ames*, 605 U.S. at 308–09; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000). *Skrmetti* did not alter this standard. The parties therein did not argue discriminatory purpose. *See Skrmetti*, 145 S. Ct. at 1832. And the Court acknowledged that heightened scrutiny could be triggered even in the face of a facially neutral classification if the classification was "motivated by an invidious discriminatory purpose." *Id*.

9

At the pleadings stage Plaintiffs are not required to "allege specific facts establishing a prima facie case of discrimination in their complaint," or even show that discrimination is probable. *Savel*, 96 F.4th at 942–43; *Amos v. Lampo Grp., LLC*, No. 24-5011, 2024 WL 3675601, at *2–5 (6th Cir. Aug. 6, 2024). Instead, Plaintiffs need only allege facts that could support a plausible inference of discrimination because of sex. *See, e.g.*, *Savel*, 96 F.4th at 942–44. They have done so.

As Plaintiffs allege, the Exclusion denies coverage because they are transgender and for no legitimate medical reason. The procedures and medications Plaintiffs seek are generally covered by the Program and for their non-transgender colleagues. Doc. 89 ¶¶ 85-89, 91-93, 113-115, 123-124, 136-137, 140-142, 166-175, 183-85. Defendant's Exclusion takes coverage for those drugs and procedures away from Plaintiffs precisely because of their sex and transgender status. Doc. 89 ¶¶ 165-175, 181, 185; *Savel*, 96 F.4th at 944 (allegations of employer permitting secular exemptions to vaccine requirement but denying religious ones stated a plausible Title VII claim). The Exclusion contravenes the World Professional Association for Transgender Health (WPATH) standards of care and the consensus of the preeminent medical associations. Doc. 89 ¶¶ 58-59. The Exclusion also conflicts with the longstanding medical policy of BCBST and CVS Caremark— the very companies on whose expertise Defendants rely to administer the plan—which provides for coverage of transgender-related care. Doc. 89 ¶¶ 171-75, 180-81. Defendants considered rescinding the Exclusion without telling members, even when asked directly, and ultimately retained the Exclusion despite themselves observing it could be discriminatory. Doc. 89 ¶¶ 176-82. These allegations, which must be taken as true on a motion to dismiss, more than support a plausible inference that Defendants maintain the Exclusion to ensure that trans people receive unequal coverage because of their sex. *See Lee*, 2023 WL 4188341, at *3–4 (allegations that a

greater portion of male than female spousal hires were awarded tenure, and that defendants denied plaintiff tenure against her superiors' recommendations, were sufficient to support an inference of sex discrimination); *see also Savel*, 96 F.4th at 944. Widespread mistreatment of and animus against transgender people by governments and private actors around the nation, including by the government in Tennessee, further supports Plaintiffs' position. Doc. 89 ¶¶ 144-52.

Defendants suggest other reasons for the Exclusion. Doc. 93 at 19. But these reasons cannot be credited at the pleadings stage. Rather, Plaintiffs' allegations that Defendants lack a legitimate basis for the Exclusion must be taken as true. *See* Doc. 101 at 40-41; *Iqbal*, 556 U.S. at 679; *Davis v. Prison Health Servs.*, 679 F.3d 433, 439–40 (6th Cir. 2012) (finding the question of whether defendants removed inmate from work program for asserted safety reasons or because of anti-gay animus inappropriate for resolution at the motion to dismiss stage); *Hart v. Hillsdale County*, 973 F.3d 627, 636 (6th Cir. 2020) ("[W]e note that our court is rarely the appropriate forum in which to resolve factual disputes regarding intent—especially on a motion to dismiss."). Developing the record will allow Plaintiffs to continue to carry their burdens at appropriate stages in the litigation. For example, discovery may reveal a record of animus or that Defendants' stated reasons for the Exclusion are pretext for discrimination.

Even now, Plaintiffs' allegations provide strong grounds to infer Defendants' speculative justifications are pretext for discrimination. The Exclusion plays no role in protecting members from health risks or "new" and "experimental" treatments. *See* Doc. 93 at 19. The Program already only covers care that is medically necessary and separately excludes "experimental, investigational, or unproven" treatments. Doc. 93-1 at 90; Doc. 89 ¶ 173. Moreover, transgender care is safe and neither new nor experimental. Doc. 89 ¶¶ 57-64. And the Program covers a wide swath of care, ranging from common medical procedures that have existed for decades to riskier

and newer procedures, including the very same procedures Plaintiffs seek—as long as those procedures are not for "sex transformations." Doc. 89 ¶¶ 166, 172-75, 180-81, 185; Doc. 93-1 at 76-82. Moreover, Defendants point to nothing in the Complaint or Plan documents to support their suggestion that psychotherapy alone could be helpful or less risky to treat gender dysphoria. In fact, denying transgender people access to standard-of-care pharmacological and surgical treatments can be catastrophic. Doc. 89 ¶¶ 55-57, 59, 85, 90, 95, 101, 103, 108, 110, 125, 131, 142-43, 187.

Additionally, the Exclusion lacks any economic justification, which in any event is not a defense to Title VII claims. *Manhart*, 435 U.S. at 717 ("[N]either Congress nor the courts have recognized [a cost] defense under Title VII."). The Program has had excess reserves while maintaining the Exclusion. Doc. 89 ¶ 179. And the cost of removing the Exclusion would be miniscule. *Id.* ¶ 178. Indeed, the sequelae of untreated gender dysphoria, resulting in an increased need for health care, suggest that maintaining the Exclusion costs the Program more than it saves. *Id.* ¶¶ 55-57, 59, 85, 90, 95, 101, 103, 108, 110, 125, 131, 142-43, 187.

### D. *SKRMETTI* DOES NOT CHANGE THAT PLAINTIFFS ALSO STATE A CLAIM BASED ON SEX STEREOTYPING.

*Skrmetti* does not change that Plaintiffs state a claim based on sex stereotyping. Doc. 101 at 16-17. In *Skrmetti*, the court reasoned SB1 did not classify based on sex stereotypes because it lacked an overt or covert sex classification and reflected legislative findings about the relative risks and benefits of the treatments. *Skrmetti*, 145 S. Ct. at 1832.

Neither can be assumed to be true here. Rather, Defendants commit sex stereotyping equivalent to the employers in *Harris* and *Smith v. City of Salem*, who penalized transgender women for adopting feminine appearance and behavior, including disclosing their intent to have surgery. *Harris Funeral Homes*, 884 F.3d at 568, 576–77; *Smith v. City of Salem*, 378 F.3d 566

(6th Cir. 2004) (transgender woman stated Title VII and Equal Protection claims); Doc. 101 at 16-17. Unlike the age and diagnosis-specific classifications of SB1, the Exclusion restricts coverage based on sex. Doc. 89 ¶ 9-12, 166, 172-75, 180-81, 185; *supra* § III.B-C. Defendants adopted the Exclusion despite the strong medical basis to cover transgender-related health care and the harms caused by withholding coverage that many Tennesseans need to be able to afford care. *See, e.g.*, Doc. 89 ¶¶ 55-57, 59, 187; *supra* § II.D. Through the Exclusion, Defendants determine based on sex which employees can have coverage for treatments that make their sex characteristics typically female. They permit coverage for women who were identified as female at birth, but bar coverage for women, like Plaintiffs, who were labeled male at birth. Doc. 89 ¶¶ 12, 166, 172-75, 181, 185. These facts are distinct from *Skrmetti* and support a plausible inference of sex stereotyping.

### E. THE FACTS THAT UNDERPINNED *SKRMETTI'S* CONCLUSION THAT SB1 CLASSIFIED BASED ON AGE AND MEDICAL USE ARE ABSENT HERE.

Plaintiffs' case differs from *Skrmetti* in legally significant ways. In *Skrmetti*, the Court concluded SB1 classified based on age and medical use rather than sex: age, because it forbade medical treatments for minors but permitted them for adults; medical use, because based on legislative findings about risk and benefits of treatments it permitted them for some diagnoses but not for others, including gender dysphoria. *Skrmetti*, 145 S. Ct. at 1830–31.

Defendants' Exclusion does not work that way. The terms of the Exclusion itself restrict coverage based on the employee's sex and not based on age or medical use. Doc. 89 ¶¶ 9-12, 166, 172-75, 180-81, 185. It bars care for members of all ages, including Plaintiffs who are adults. It does not list specific treatments or "qualifying diagnoses" to which those treatments apply. *Id.* *Compare* Health, Safety and Environmental Protection, Health and Welfare of Minors, Chapter Definitions, Tenn. Code Ann. §§ 68-33-102 (3), (5), (8) (defining "hormone," "medical procedure," and "puberty blocker"), Health, Safety and Environmental Protection, Health and

Welfare of Minors, Prohibitions, Tenn. Code Ann. § 68-33-103(b) (listing conditions and diseases) *with* Doc. 89 ¶ 9, 166 (excluding treatment "for, or related to, sex transformations"). Instead, the Exclusion bars any treatment (except counseling) when characterized as a "sex transformation," a categorization that depends on the sex of the employee. Doc. 89 ¶¶ 9-12, 166, 172-75, 180-81, 185.

Even if the Exclusion did incorporate a gender dysphoria diagnosis, both "sex transformation" and gender dysphoria are precise proxies for transgender status in this context. First, incongruence between sex assigned at birth and gender identity is a defining feature of gender dysphoria and transgender status. Doc. 89 ¶¶ 54-55, 183. The diagnosis is "bound up with sex," which is because of sex under Title VII. *See supra* § III.A. Further, while not all transgender people require hormones or surgery to treat gender dysphoria, many do. Doc. 89 ¶¶ 54, 57-64, 183-84. All transgender people and only transgender people bear the risk of needing treatment for gender dysphoria. *Id*. Thus, the Exclusion as alleged or if understood to incorporate a gender dysphoria diagnosis is an *exact* proxy for transgender status. And because of it, cisgender members *are* insured against the risk of needing a vaginoplasty or breast reconstruction, but transgender members are not. Doc. 89 ¶¶ 165-174, 183-185; *see Newport News*, 462 U.S. at 678.

## IV. CONCLUSION

*Skrmetti* does not change that Plaintiffs plausibly allege Defendants' Exclusion deprived them of coverage precisely because of their sex, in violation of Title VII. The Court should deny Defendants' motions to dismiss.

Dated: September 2, 2025

*/s/ Darren Teshima*
Darren Teshima (admitted *pro hac vice*)
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
E-mail: dteshima@cov.com

Suzan F. Charlton (admitted *pro hac vice*)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 778-5465
E-mail: scharlton@cov.com

*Attorneys for Plaintiffs*

*Respectfully submitted,*

*/s/ Scott Hickman*
Scott Hickman (No. 17407)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Telephone: (615) 742-4200
Facsimile: (615) 742-4539
shickman@srvhlaw.com

*Attorney for Plaintiffs*

*/s/ Phillip Cramer*
Phillip F. Cramer (No. 20697)
SPERLING KENNY NACHWALTER, LLC
1121 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (615) 742-4535
pcramer@sperlingkenny.com

*Attorney for Plaintiffs*

*/s/ Ezra Cukor*
Ezra Cukor (admitted *pro hac vice*)
Z Gabriel Arkles (admitted *pro hac vice*)
Cathy Zhang (*pro hac vice* motion pending)
Shayna Medley (admitted *pro hac vice*)
ADVOCATES FOR TRANS EQUALITY
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: (646) 862-9396
Facsimile: (646) 993-1686
garkles@transequality.org
ecukor@transequality.org
smedley@transequality.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, the undersigned filed the foregoing document using the Court's Electronic Court-Filing system, which sent notice of filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Steven J. Griffin (Bar No. 40708)<br>Ryan N. Henry (Bar No. 40028)<br>Reed N. Smith (Bar No. 40059)<br>Brooke A. Huppenthal (Bar No. 40276)<br>Office of the Tennessee Attorney General & Reporter<br>P.O. Box 20207<br>Nashville, TN 37202-0207<br>Phone: 615-741-9598<br>steven.griffin@ag.tn.gov<br>ryan.henry@ag.tn.gov<br>reed.smith@ag.tn.gov<br>brooke.huppenthal@ag.tn.gov | Counsel for State Defendants |
| David M. Sanders (Bar No. 016885)<br>Jessica Jernigan-Johnson (Bar No. 032192)<br>Knox County, Tennessee<br>400 W. Main St., Suite 612<br>City-County Building<br>Knoxville, Tennessee 37902<br>Telephone: 865-215-3236<br>Facsimile: 865-215-2936<br>david.sanders@knoxcounty.org<br>jessica.johnson@knoxcounty.org | Counsel for Defendant Knox County Board of Education |

16